[No. A121651. First Dist., Div. Two. Oct. 9, 2009.]

IFTIKHAR NAZIR, Plaintiff and Appellant, v.
UNITED AIRLINES, INC., et al., Defendants and Respondents.

## Counsel

Law Offices of Phil Horowitz, Phil Horowitz and Moira McQuaid for Plaintiff and Appellant.

Littler Mendelson, Philip L. Ross, Nancy E. Pritikin and Kurt R. Bockes for Defendants and Respondents.

## Opinion

**RICHMAN, J.**—Our Supreme Court has said that the purpose of the 1992 and 1993 amendments to the California summary judgment statute was "to liberalize the granting of motions for summary judgment." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854 [107 Cal.Rptr.2d 841, 24 P.3d 493].) It is no longer called a "disfavored remedy." It has been described as having a salutary effect, ridding the system, on an expeditious and efficient basis, of cases lacking any merit. And that it has, as shown by the many cases affirming a summary judgment.

At the same time, the summary judgment procedure has become the target of criticism on a number of fronts. Some particular criticism is directed to the procedure in employment litigation, including that it is being abused, especially by deep pocket defendants to overwhelm less well-funded litigants. More significantly, it has been said that courts are sometimes making determinations properly reserved for the fact finder, sometimes drawing inferences in the employer's favor, sometimes requiring the employees to essentially prove their case at the summary judgment stage. Here we confront the poster child for such criticism, in a case involving what may well be the most oppressive motion ever presented to a superior court.

Plaintiff Iftikhar Nazir, a man of Pakistani ancestry, worked for United Airlines, Inc. (United), for over 16 years, during which time he was called scurrilous names and was the victim of numerous other indignities. Plaintiff reached the level of mechanic supervisor, the only person of color to ever hold that position. He was terminated in 2005 by his supervisor, Bernard

Petersen, on the basis that plaintiff violated United's zero tolerance policy in an incident with a female employee of an outside service provider. Plaintiff sued United and Petersen (when referred to collectively, defendants) in a complaint that, save perhaps for two battery and fraud causes of action, asserted rather typical claims grounded on harassment, discrimination, and retaliation. What ensued was hardly typical.

Defendants filed a motion for summary judgment/summary adjudication, seeking adjudication of 44 issues, most of which were not proper subjects of adjudication. Defendants' separate statement was 196 pages long, setting forth hundreds of facts, many of them not material—as defendants' own papers conceded. And the moving papers concluded with a request for judicial notice of 174 pages. All told, defendants' moving papers were 1,056 pages.

Plaintiff's opposition was almost three times as long, including a 1,894-page separate statement, papers the trial court would later disparage as "mostly verbiage," a description with which, as will be seen, we disagree. Curiously, no such criticism was leveled at defendants' papers, not even those in reply, papers that defy description.

Defendants' reply included, and properly, their response to plaintiff's additional disputed facts. Defendants' reply also included, not so properly, a 297-page "Reply Separate Statement" and 153 pages of "Exhibits and Evidence in Support of Defendants' Reply." And the reply culminated with 324 pages of evidentiary objections, consisting of 764 specific objections, 325 of which were directed to portions of plaintiff's declaration, many of which objections were frivolous. In all, defendants filed 1,150 pages of reply.

Five thousand, four hundred, fifteen pages of material were before the trial court which, following argument, issued its order granting summary judgment, the substance of which order began as follows: "Upon due consideration . . . and having taken the matter under submission, [¶] The Court finds as follows: [¶] Despite its girth, Plaintiff's opposition to the separate statement of material facts is mostly verbiage, and utterly lacking in the identification and presentation of *evidence* demonstrating a disputed issue of fact." There followed several pages of discussion which did not consider the evidence favorably to plaintiff, as the law requires. Then, after granting summary judgment, the order ends with these two one-sentence rulings:

"2. Plaintiff's 47 evidentiary objections are OVERRULED.

"3. Defendants' evidentiary objection No. 27 is OVERRULED, and the remainder of the Defendants' evidentiary objections are SUSTAINED."

This, then, is what is before us for de novo review: an order granting summary judgment that purports to sustain without explanation 763 out of 764 objections to evidence, in a record the likes of which we have never seen—not here, not in the combined 11 years of law and motion experience of the members of this panel.

Nevertheless, we deal with what is before us, and first hold that the trial court's "ruling" on defendants' objections was manifestly wrong. We then review the matter considering all the evidence properly in the record. And we reverse the summary judgment, concluding that eight causes of action must be decided by a jury.

## THE GENERAL BACKGROUND

### The Complaint

On July 7, 2006, plaintiff filed a complaint naming two defendants, United and Petersen. The face sheet of the complaint listed 11 causes of action, the first three of which were for harassment, discharge, and retaliation in violation of the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.). The body of the complaint, however, alleged 14 causes of action, with the second, fourth, and sixth causes of action being harassment, discrimination, and retaliation in "violation of public policy and the California Constitution" (public policy). In all, therefore, plaintiff alleged 14 causes of action, styled as follows: (1) harassment (religion, color, ancestry, and national origin); (2) harassment, public policy; (3) discharge (religion, color, ancestry and national origin); (4) discharge, public policy; (5) retaliation for opposing unlawful harassment and discrimination; (6) retaliation, public policy; (7) failure to take all reasonable steps to prevent discrimination and harassment; (8) discharge because of history or disability or perceived disability; (9) discharge in retaliation for taking leave under California's Moore-Brown-Roberti Family Rights Act (CFRA; Gov. Code, § 12945.2); (10) breach of contract; (11) breach of covenant of good faith and fair dealing; (12) fraud; (13) battery; and (14) intentional infliction of emotional distress.

Plaintiff voluntarily dismissed the 10th and 11th causes of action, and concedes he is not appealing as to the second cause of action. We thus have before us 11 causes of action.

### The *Girth* in the Record: The Inappropriate Papers

On August 30, 2007, defendants filed a "Motion for Summary Judgment or, in the Alternative, Summary Adjudication," with moving papers totaling

1,056 pages. Plaintiff filed his lengthy opposition which, as quoted above, the trial court described as "mostly verbiage, and utterly lacking in the identification and presentation of *evidence* demonstrating a disputed issue of fact."

Seemingly emboldened by this description, defendants' brief here begins this way: "As in Macbeth's soliloquy, Appellant's Opening Brief (AOB), like his summary judgment opposition below, is full of 'sound and fury, [but ultimately] signifying nothing.' Despite filing an 1894 page(!) opposition separate statement, which the trial court found . . . in a manner deliberately calculated to obfuscate whether any 'purportedly disputed facts were actually controverted by admissible evidence,' the trial court properly granted summary judgment in this case. As with Nazir's opposition statement, his AOB is 'mostly verbiage, and utterly lacking in the identification and presentation of *evidence* demonstrating a disputed issue of fact.' "

Passing over whether such disparagement is effective advocacy, the "girth" of materials before the trial court began with defendants, whose 1,056 pages of moving papers were in great part inappropriate, beginning with the motion itself.

As noted, the motion sought summary adjudication of 44 issues. As apt here, a defense-side motion for summary adjudication is appropriate if one or more "cause of action has no merit." (Code Civ. Proc., § 437c, subd. (f)(1).) Summary adjudication must completely dispose of the cause of action to which it is directed. (*Ibid.*; see *Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 321 [39 Cal.Rptr.2d 296].) More than half of the 44 issues defendants sought to have summarily adjudicated fail to meet that burden, as they would not dispose of the claim.[1] The effect of this misconduct is not insignificant, illustrated by the fact that many of the "issues" all repeat to some extent many claimed "undisputed material facts," repetitive facts resulting in countless pages of utterly unnecessary—and necessarily unavailing—material.

The deficiencies in the motion pale in comparison to those in the separate statement. "Separate statements are required not to satisfy a sadistic urge to torment lawyers, but rather to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions for [summary adjudication] and summary judgment to determine quickly and efficiently

---

[1] One example illustrates the point. Issues 5 through 21 all address plaintiff's first cause of action, for harassment. All 17 issues assert that the cause of action "fails," with issues 12 through 21 each asserting that, to the extent plaintiff's claim is based on derogatory statements by specific employees or specific incidents, it "fails" because the statements or incidents were "untimely and not administratively exhausted." But if, for example, defendants were to succeed on issue 15 involving one employee, such issue would not dispose of the cause of action. Issue 15, along with the other nine, was not a proper issue for summary adjudication.

whether material facts are undisputed." (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335 [282 Cal.Rptr. 368].) The separate statement "provides a convenient and expeditious vehicle permitting the trial court to hone in on the truly disputed facts." (*Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 74 [50 Cal.Rptr.3d 149].) That hardly describes defendants' separate statement here.

The separate statement is, as noted, 196 pages. The exact number of supposedly material facts is impossible to know without actually counting them, as many of the facts are often repeated with the same numbers. But whatever the number, many of the facts are not material, as defendants concede, their separate statement beginning with this quizzical footnote: "The facts are deemed undisputed for purposes of this motion only and do not constitute any admission. For purposes of this motion only, Plaintiff's statements are accepted as true. Not all facts listed herein are necessarily material, as certain facts are asserted for background, foundational, information, or other purposes. Also, by including the facts set forth herein, Defendants are not waiving their right to challenge the admissibility of such facts in connection with this motion or for other purposes in this case."

We offer two observations about this footnote. The first is that it ignores the advice from the leading practice treatise: "*PRACTICE POINTER*: . . . [¶] Include only those facts which are *truly material* to the claims or defenses involved because the separate statement effectively *concedes* the materiality of whatever facts are included. Thus, if a triable issue is raised as to any of the facts in your separate statement, the motion must be denied!" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2009) ¶ 10:95.1, p. 10-35 (rev. # 1, 2009).) The second is that there seems to be some disconnect between defendants' concession that "Plaintiff's statements are accepted as true" and defendants' 325 objections to plaintiff's testimony. In short, defendants' separate statement was particularly inappropriate.[2]

The deficiencies carried over to the reply papers, which included a 297-page reply separate statement. There is no provision in the statute for this. The reply also included 153 pages of "Exhibits and Evidence in Support of Reply." No such evidence is generally allowed. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499].) And, of course, there were the objections, 764 in all, which we discuss below. Suffice to say that there is plenty of blame for the "girth" the trial court criticized, most of which, we conclude, lies at the feet of defendants.

---

[2] This is not the first time that lead counsel for defendants has been criticized for a defective separate statement. (See *Reeves v. Safeway Stores* (2004) 121 Cal.App.4th 95, 105 [16 Cal.Rptr.3d 717] (*Reeves*).)

But neither the inappropriateness of defendants' papers nor their excessive volume is the worst aspect of those papers. No, that is the misleading picture those papers presented. An article coauthored by an experienced superior court judge has "intended to point out, in ascending order of seriousness, certain fatal errors and other problems [the court has] encountered" in connection with summary judgment motions, at the very top of which are motions "that attempt to 'hide' triable issues of [material] fact." (Brenner & March, *Use and Abuse of MSJs: A View from the Bench* (2007) 49 Orange County Law. 34, 37, boldface omitted.) The article admonishes that a motion "should never cite evidence out of context in an effort to conceal a clearly triable issue of [material] fact," going on to cite two recent examples in that judge's court, one in a sexual harassment case, the other in one for wrongful termination. (*Id.* at p. 37.) Here, in vivid detail, is a third.

## DISCUSSION

### 1. *Summary Judgment Law and the Standard of Review*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) As applicable here, moving defendants can meet their burden by demonstrating that "a cause of action has no merit," which they can do by showing that "[o]ne or more elements of the cause of action cannot be separately established . . . ." (§ 437c, subd. (*o*)(1); see also *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486–487 [59 Cal.Rptr.2d 20, 926 P.2d 1114].) Once defendants meet this burden, the burden shifts to plaintiff to show the existence of a triable issue of material fact. (§ 437c, subd. (p)(2).)

On appeal "[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]" (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc., supra,* 14 Cal.4th at p. 487.) As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320 [7 Cal.Rptr.3d 628]: "[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit." (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94].)

But other principles guide us as well, including that "[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them." (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 [105 Cal.Rptr.2d 652].) And we must " 'view the evidence in the light most favorable to plaintiff[] as the losing part[y]' and 'liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor.' " (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97 [84 Cal.Rptr.3d 734, 194 P.3d 1026].)

This last principle could be problematic here, in light of the trial court's "ruling" on defendants' objections to evidence which, if affirmed, would mean that plaintiff's evidence was virtually nonexistent, with little left to be viewed favorably. To determine what the evidence is, therefore, we begin by addressing the court's "ruling" on the objections to evidence.

### 2. *The Ruling on Defendants' Evidentiary Objections Was Error*

Plaintiff's opposition included 47 objections to defendants' evidence. Defendants' reply included 764 objections, set forth in 324 pages.[3] The trial court had issued a tentative ruling on the motion, which ruling made no mention of the objections. At the hearing neither counsel made any reference to the objections, and no request for any rulings. The court likewise made no mention of the objections, and at the conclusion of the hearing took the matter under submission. The court thereafter filed its order granting summary judgment, which order concluded, however inexplicably, with these two "rulings":

"2. Plaintiff's 47 evidentiary objections are OVERRULED.

---

[3] This was in utter disregard of all good advice, including from us. In April 2007, we published *Demps v. San Francisco Housing Authority* (2007) 149 Cal.App.4th 564 [57 Cal.Rptr.3d 204] (*Demps*), in which we overruled our earlier decision in *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410 [267 Cal.Rptr. 819]. Doing so, we quoted the law and motion judge in *Biljac* who, referring to the "voluminous" objections made there, said that ruling on the objections would be a " ' "horrendous, incredibly time-consuming task." ' " (*Demps, supra*, at pp. 574–575, fn. 4.) This observation, we noted, may have been apt in *Biljac*, an antitrust case. But we went on: "However, such concerns too often present themselves in noncomplex cases as well, seemingly because, however inappropriately, litigants file blunderbuss objections to virtually every item of evidence submitted. This is hardly good advocacy, and it unnecessarily overburdens the trial court. And were counsel to reject this approach, and object instead only to items of evidence that are legitimately in dispute and pertinent to the disposition of the motion, it should ease the burden significantly." (*Demps, supra*, at pp. 578–579, fn. 6.) Our advice was given over nine months before defendants filed their objections here.

"3. Defendants' evidentiary objection No. 27 is OVERRULED, and the remainder of the Defendants' evidentiary objections are SUSTAINED."

Paragraph 3, we conclude, was manifest error.

Acknowledging that some of defendants' objections could perhaps have been properly sustained, plaintiff contends that the trial court's blanket ruling sustaining all but one of defendants' objections was error. We could not agree more, and hold that all of plaintiff's admissible evidence is before us.

 It is probably enough to note that the evidence is before us because defendants' objections could be considered waived, as not having been ruled on by the court, as we held in *Demps, supra,* 149 Cal.App.4th at page 578: "[W]e hold here . . . that a trial court presented with timely evidentiary objections in proper form must expressly rule on the individual objections, and if it does not, the objections are deemed waived and the objected-to evidence included in the record."

It is true that the trial court "ruled," however conclusorily, that all objections save one were sustained. This is hardly a ruling, as it could not provide any meaningful basis for review. But even if what the trial court did is viewed as a ruling, the effect would be the same—plaintiff's evidence would be before us, as the ruling was wrong.

Defendants assert that we review evidentiary rulings on an abuse of discretion basis, citing *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915]. Assuming without deciding that such standard applies,[4] we have no hesitancy in holding that the sustaining of all but one of defendants' 764 objections was an abuse of discretion. Put otherwise, there is no way that the trial court could properly have sustained 763 objections " ' "guided and controlled . . . by fixed legal principles." ' " (*Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 695 [84 Cal.Rptr.3d 351].) There are many reasons why.

Some of the sustained objections did not even assert any basis for the objection!

---

[4] Whether abuse of discretion is the proper standard of review when rulings on evidentiary objections are based on papers alone presents an interesting question, one that is by no means settled. *Carnes* itself recognizes a split of authority. (*Carnes v. Superior Court, supra,* 126 Cal.App.4th at p. 694.) And a leading commentary states the rule this way: "Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion. [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶ 8:168, p. 8-130 (rev. # 1, 2008), italics omitted.)

Some of the sustained objections were to plaintiff's testimony about his dates of employment, his religion, his skin color, and his national origin.

Over 250 of the sustained objections failed to quote the evidence objected to, in violation of California Rules of Court, rule 3.1354.

Twenty-seven of the sustained objections were to plaintiff's brief, not his evidence.

Beyond all this, many of the objections were frivolous. Two illustrations should suffice. First, plaintiff testified that "[s]ome of the names [he] was called by [his] co-workers . . . were 'sand nigger,' 'sand flea,' 'rag head,' and 'camel jockey.' " Defendants lodged four objections, two of which were lack of foundation and hearsay.[5] No adjective is adequate to describe an objection that one who is called names lacks "foundation" to testify about them. And one does not need to be Wigmore to know that plaintiff was not introducing the names for their truth.

Second, plaintiff testified to the many times he talked to Petersen and others, bringing to their attention the various mistreatments he claimed to have suffered. One bit of testimony was this: "Throughout my tenure as a supervisor . . . I repeatedly complained to Mr. Petersen that I felt I was being discriminated against by the other white supervisors in the department. [¶] I also complained at least two times to Rick Wysong, Mr. Petersen's supervisor, on about December 5, 2001 and January 3, 2002, regarding Alister MacIness' and the other supervisors' harassment of me. . . . [¶] . . . In the meetings I told Mr. Wysong that I had already complained to Mr. Petersen about the problems I was experiencing since my elevation to supervisor . . . but that Mr. Petersen was letting the discriminatory conduct and behavior go unpunished. [¶] Mr. Wysong promised me that he would change Mr. Petersen's behavior. Mr. Wysong also said that he could not make Mr. Petersen and the other supervisors like me."

Plaintiff's testimony was set forth in four separate paragraphs, to each of which defendants objected. The objection to the first paragraph was "lacks foundation." The objections to the other three paragraphs were more grandiose: "Plaintiff's statement lacks foundation, is speculative, inserts improper opinion, argument, and conclusion (instead of evidentiary fact) and is therefore inadmissible. Cal. Evid. Code §§ 702, 800, 805; *Buehler v. Alpha Beta Co.* (1990) 224 Cal.App.3d 729, 733 [274 Cal.Rptr. 14]; *Hoover Community Hotel Development Corp. v. Thomson* (1985) 167 Cal.App.3d 1130,

---

[5] The other two objections were that plaintiff failed to exhaust his administrative remedies and the statute of limitations.

1136–1137 [213 Cal.Rptr. 750] (a declaration as to someone else's intent is mere opinion or conclusion and cannot create a triable issue of fact); see also *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1240–1241 [132 Cal.Rptr.2d 57]." Can this be serious? Can counsel see themselves rising at trial with those objections while plaintiff is testifying before a jury?[6]

Were all that not enough, objection number 27—the one objection the trial court overruled—should have been sustained, at least as to the second sentence.[7]

In sum, the trial court's order sustaining all but one of defendants' objections was a manifest abuse of discretion. Thus, plaintiff's evidence, along with that of defendants, is in the record here, and we turn next to exposition of that evidence, evidence that, to put the matter in complete context, we set forth at some length.

### 3. *The Facts*

Plaintiff describes himself as a dark-skinned man of Kuwaiti and Pakistani national origin and Pakistani ancestry. He is a practicing Muslim. Plaintiff began employment at United in April 1989 as a mechanic. In 2001 he was promoted to supervisor of mechanics in the facilities maintenance department, becoming the only person of color ever to hold that position.

Petersen was the manager of facilities, a position he had held since 1991. Petersen was plaintiff's immediate supervisor, and gave plaintiff his performance evaluations, which for the years 2001, 2002, and 2003 rated plaintiff as "achieved expectations." The year 2004 was a different story, as discussed below. It was Petersen who imparted the offer of promotion to plaintiff, and Petersen who terminated plaintiff, a fact heavily relied on by the trial court in rejecting plaintiff's discrimination claim. The complete facts surrounding the promotion and the termination will be set forth in connection with our discussion of that claim.

Plaintiff testified to countless instances of mistreatment directed at him over the years, including that his coworkers called him scurrilous names,

---

[6] We sometimes "hear" that a common practice in cases staffed by multiple levels of lawyers is to assign the most junior lawyer to "do the objections," which was apparently done here. Perhaps a wiser practice would be to have the most experienced lawyer, presumably with a better understanding of the law of evidence, deal with the objections.

[7] The second sentence read: "Even though Mr. Petersen was aware of this conduct from my co-workers, he did not do anything to try to make them stop saying disrespectful things about me."

including "to [his] face." Plaintiff was called, among other things, "sand nigger," "sand flea," "rag head," and "camel jockey." Coworkers brought pieces of sandpaper to plaintiff and asked him to point out where he was from.

The first specific instance of name calling was in 1994, when United employee Nick Basille called plaintiff a "sand flea." According to plaintiff, a United supervisor was present and heard the statement, and said jokingly, while laughing, "Yes, you should not say that." The supervisor did not reprimand Basille. A few months later, Basille called plaintiff a "camel jockey," and a few months after that a coworker asked plaintiff if people in his country "rode camels with saddles . . . when they turned 16."

In late 1995 United employee Rich Garvin told plaintiff words to the effect, "You f*cking Muslims are all the same and Bernie Petersen is right about you people." Plaintiff immediately complained to supervisor Randy McKim, who promised to follow up and investigate. Plaintiff was never interviewed as part of any investigation, and approximately two weeks later he complained to Petersen himself that there had been no followup. Plaintiff apparently repeated Garvin's comment to Petersen, who did nothing to deny the attribution to him, saying only that he could do nothing at that point because too much time had elapsed.

At one time a flyer was slipped under plaintiff's door. The flyer depicted Saddam Hussein with an arrow through his forehead, and was titled "Wanted, Butcher of Baghdad." Plaintiff reported this to Petersen, but was never interviewed about it by anyone. Another time, another flyer was slipped under plaintiff's door. This one depicted Saddam Hussein and one of his generals with the statement, "The war isn't going as planned. I need an expert at downing a large fleet of U.S. planes . . . ." This was followed by a particularly obscene flyer. Again, no followup.

In the late 1990's, plaintiff's car was vandalized in the United parking lot, the air having been let out of the tires and all four valve stems removed. The following day, flyers were posted on the employee bulletin boards throughout the facilities maintenance department. The flyer had valves attached, and said: "Wade 1 Pak Man 0." According to plaintiff, the "Wade" reference was to United employee Pete Wade, the suspect in the vandalism, "Pak Man" a reference to plaintiff's Pakistani national origin. Plaintiff was never interviewed as part of any investigation into the incident, though the flyers were visible to everyone in the department, including Petersen.

In June 2001 United employee John Criswell called plaintiff "Paki"[8]; again plaintiff complained to Petersen; again no one contacted plaintiff. Then, in early August Criswell told plaintiff words to the effect that "You need to be sent back to that camel where you came from." Plaintiff told United supervisor Alister MacInnes about this, and he promised to do something about it. Later that day, Criswell apologized.

Plaintiff also presented evidence concerning how in 2003 he had been reported to the Federal Bureau of Investigation as a "possible terrorist," this the result of a telephone message in Urdu that had been left for him, but on a coworker's line that formerly belonged to plaintiff. The facts about this are somewhat convoluted, and ultimately nothing came of it. However, plaintiff did complain of the incident, via a June 24, 2003 e-mail to Sheila Asfaha in the human resources department.

Throughout, and repeatedly, plaintiff would complain to Petersen about the mistreatment, testifying to numerous conversations with Petersen about this. One specific conversation was on July 26, 2001, where Petersen confirmed that he knew plaintiff was being called derogatory names by coworkers, saying words to the effect, "People downstairs have made disrespectful remarks to me about you. I have ignored them in the past, but now I will not, and you should not tolerate this behavior either." But the behavior did not stop.

Plaintiff also complained from time to time to Wysong, Petersen's supervisor. At one point, plaintiff met with Wysong, and told him he had already complained to Petersen about the problems he was experiencing since his promotion, and that Petersen was letting the behavior go unpunished. Wysong promised that he would change Petersen's behavior, noting, however, that he could not make "Petersen and the other supervisors like me."

Plaintiff also complained to employees in United's human resources department, including to Asfaha. Plaintiff told Asfaha about the mistreatment to which he was being subjected at the hands of his coworkers. He also told Asfaha that he did not think Petersen supported him, a feeling he had from the time he was first promoted to supervisor.

By mid-2004 plaintiff had reached the point where, he claimed, he could not take anymore and "went outside of United's human resources department to complain to Sandra Rossi of United's employee assistance program regarding the discrimination and harassment [he] was experiencing." Plaintiff

---

[8] According to plaintiff, Criswell apparently did diversity and harassment training for United.

met with Rossi on August 16, 2004, and described the mistreatment, including from his manager Petersen. Plaintiff took a test Rossi provided, the results of which, according to plaintiff, showed he was depressed. Rossi recommended the names of medical professionals, and also recommended that plaintiff speak to Francine Banford, the director of human resources. He did, on August 20, 2004, and among other things told Banford that the discriminatory mistreatment from his peers and Petersen, and Petersen's failure to investigate or take any action in response to his complaints, was causing him stress. In accordance with Rossi's advice, plaintiff began seeing a therapist.

On September 20, 2004, plaintiff went to Petersen to tell him personally that he was taking a medical leave of absence at the direction of his doctor, Laura Davies, M.D. According to plaintiff, he told Petersen unequivocally that treatment he received from his coworkers in the facilities maintenance department had made him ill and he needed professional help to recover. Plaintiff began CFRA leave that day, and would not be released to return to work until January 2005. During the leave, plaintiff was in contact with United's own doctor, Joseph Semkiu, M.D., and with Rossi, who monitored the situation. But even the leave period was not without incident.

In mid-December 2004, plaintiff met with Dr. Semkiu, Rossi, and Petersen to coordinate his return to work. They discussed the conditions in the facilities maintenance department, and Petersen asked plaintiff why he would want to return to his management position if it caused him so much pain, suggesting that he take a demotion back to mechanic. Plaintiff refused, and on January 11, 2005, returned to work.

On February 4, 2005, plaintiff talked to Petersen about plaintiff's need for more electricians on his crew. Petersen's response was to "make fun" of plaintiff and to "suggest that [he] should slap a tool belt on one of [his] lead mechanics and get him to work harder." Plaintiff complained to Anita Davis of the human resources department.

On March 7, 2005, plaintiff was given his 2004 performance evaluation (dated Feb. 23, 2005), in which he was rated as "needs improvement," the first time he had ever been rated less than "meets expectations." Plaintiff discussed the evaluation with Petersen, who told plaintiff he "should try harder to make friends with the people who were responsible for harassing" him.

On April 4, 2005, plaintiff asked Petersen if he could work four hours and train for four hours; Petersen said "no." Plaintiff reminded Petersen that he needed this training to comply with his goals for his performance evaluation, but Petersen said he would approve the request only if plaintiff contacted all of the other supervisors and gave them the opportunity to also go for training.

In April 2005 plaintiff met with Victoria Keliihoomalu, the new human resources liaison to the facilities maintenance department. Plaintiff complained about the mistreatment he was enduring, and gave Keliihoomalu examples of the types of things to which he had been subjected. Plaintiff also told her that he did not think he would ever be treated fairly in his circle of management, and that he considered the performance review he received from Petersen on March 7, 2005, just two months after his return from extended medical leave, to be retaliation.

Plaintiff testified that he not only complained about Petersen to various people at the United facility where he worked, but on occasion he would complain to "higher management" or "world headquarters" in Illinois. Petersen was asked about this at deposition, whether plaintiff told him he had made a complaint about him to higher management. Petersen initially answered, however evasively, "he had a discussion, they asked him questions." Petersen later admitted—indeed, his own notes confirmed—that as early as 2002 plaintiff had "sent information to United Airlines World Headquarters against [Petersen] and [his] lack of action on individuals [who] did not respect him." Petersen also admitted he had heard that plaintiff complained to Larry Smith that "members of management, including Petersen, were prejudiced." And, Petersen admitted, at no time did he "ever discipline anyone for anything they did" regarding plaintiff.

On April 18, 2005, plaintiff discovered that his office had been vandalized, that his computer had been tampered with and the lock on his door glued shut. Plaintiff complained to Petersen about this. His response was to "laugh."

Three weeks later, on May 9, plaintiff was fired. The termination followed a short investigation of a complaint received by United on April 20, 2005, concerning a March 25 incident involving plaintiff and a female employee of an outside contractor. A detailed description of that incident and the investigation is also set forth in connection with the discrimination claim.

Plaintiff's termination was confirmed by a letter from Petersen dated May 10, 2005, which letter described an internal appeal process. On May 19 plaintiff sent a letter to Greg Hall, senior vice-president, "Re: Termination of Iftikhar Nazir (Appeal)." The letter was four pages long, single spaced, and included what plaintiff called "examples of the discriminatory, harassing and retaliatory conduct I have been subjected to while employed by United." The letter concluded with this: "In closing, I hope you will, please review everything. I am asking for a chance to continue working with a company I

was proud to say I worked for over the years. I would like to thank you for your time in this matter, and look forward to hearing from you shortly."[9]

On June 1 Keliihoomalu sent an e-mail to plaintiff which, among other things, said, "[Y]our appeal was received, and currently being reviewed. I will contact you soon regarding the next step." Five days later Keliihoomalu wrote again, answering a question for plaintiff, and concluding that "I will be contacting you soon with a scheduled hearing date."

Nothing more is in the record about the appeal for many months, until an e-mail from Keliihoomalu of February 27, 2006, that she will "schedule a hearing as soon as possible, and get you the details of the time and date and hearing officer by Wednesday end of the day." Such was apparently not forthcoming, and by e-mail of March 14, plaintiff said he was "still waiting for a response regarding my appeal hearing appointment." Keliihoomalu replied that day, that she would check the calendar "for the appeal hearing and get it scheduled as soon as possible." There is nothing more in the record.

Plaintiff also contacted the Department of Fair Employment and Housing (DFEH), and got it involved. What occurred vis-à-vis the DFEH is at the heart of the trial court's holding that plaintiff failed to exhaust his administrative remedies, and the details of that are set forth in connection with discussion of that issue.

### 4. *The Granting of Summary Judgment Was Error*

### A. *The Summary Judgment Cannot Be Affirmed Based on Plaintiff's Separate Statement*

The penultimate paragraph of the order granting summary judgment reads as follows: "Alternatively, this Court finds that the 1,894 page Response to Defendants' Separate Statement of Undisputed Fact fails to conform to the requirements of C.C.P. § 437c[(b)](3) and fails to follow the format requirements of CRC Rule 3.1350(f) and (h), and in fact, as the Plaintiff's Memorandum of Points and Authorities concedes, was intended to constitute in large part a second Memorandum of Points and Authorities that grossly exceeds the 20 page limitation of CRC Rule [3.1113](d) and was filed without leave of court. The court further finds that the Opposition Separate Statement, which purports to dispute all but seven of the Undisputed Facts offered by Defendants, was designed in a manner calculated to make it

---

[9] The letter was copied to 14 other people, at least three of whom were involved along the way: Petersen, Banford, and Keliihoomalu. The other 11 were apparently high-ranking United officers, including its chief executive and chief financial officer.

time-consuming and difficult for the court to ascertain which purportedly disputed facts were actually controverted by admissible evidence. Thus, the Court would be at liberty to strike or disregard Plaintiff's opposition in its entirety."

Defendants first argue that the trial court's "Alternative Ground for Granting Summary Judgment—[Plaintiff's] Willful Failure to File a Proper Separate Statement—Should be Affirmed." Such argument fails.

■ To begin with, notwithstanding the use of the word "alternatively," the trial court did not grant summary judgment on the basis of an improper separate statement. Rather, the court said only that "it would be at liberty to strike or disregard" it. In any event, had the trial court stricken plaintiff's separate statement, it would have been under the circumstances an abuse of discretion. (*Security Pacific Nat. Bank v. Bradley* (1992) 4 Cal.App.4th 89, 94–95 [5 Cal.Rptr.2d 220] [summary judgment reversed because defendant's failure to file a responsive separate statement was not a willful refusal to comply with the statute].) "[A]n immediate grant of summary judgment is, in most instances, too harsh a consequence." (*Collins v. Hertz Corp., supra*, 144 Cal.App.4th at p. 74.) "[T]he proper response in most instances, if the trial court is not prepared to address the merits of the motion in light of the deficient separate statement, is to give the opposing party an opportunity to file a proper separate statement . . . ." (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1211 [35 Cal.Rptr.3d 411].)

### B. *Summary Adjudication of the FEHA-based Harassment Claims Was Error*

#### 1. *The Law*

Government Code section 12940, subdivision (j)(1) provides that it is an unlawful employment practice for "an employer . . . or any other person, because of race, religious creed, color, national origin, ancestry . . . to harass an employee . . . . Harassment of an employee . . . shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. . . . An entity shall take all reasonable steps to prevent harassment from occurring. . . ."

■ The law prohibiting harassment is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is ' "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " (*Kelly-Zurian v. Wohl*

*Shoe Co.* (1994) 22 Cal.App.4th 397, 409 [27 Cal.Rptr.2d 457], quoting *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [126 L.Ed.2d 295, 114 S.Ct. 367]; accord, *Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1137 [90 Cal.Rptr.2d 804, 988 P.2d 1083].) This must be assessed from the "perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." (*McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1115.) And the issue of whether an employee was subjected to a hostile environment is ordinarily one of fact. (See Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2008) ¶ 10:164, pp. 10-32 to 10-33 (rev. # 1, 2008) (Chin).)

Giving credence to plaintiff's evidence, as we must, there was certainly a triable issue of fact as to harassment here.

### 2. *The Motion and the Ruling*

Defendants sought summary adjudication of the harassment claim in 17 issues, those numbered 5 through 21. With minor exceptions, defendants' arguments can be distilled to two: (a) plaintiff failed to exhaust his administrative remedies, and (b) the "harassment allegations [were] untimely."[10] The trial court latched onto the failure to exhaust argument, as shown by the court's vigorous questioning at the hearing. And the order devoted almost three pages to why the harassment claim failed for failure to exhaust administrative remedies.[11]

This, we conclude, was error.

### 3. *Plaintiff Presented Sufficient Evidence That He Exhausted His Administrative Remedies*

On July 13, 2005, plaintiff submitted to DFEH his first precomplaint questionnaire. It is on a DFEH preprinted form, and the first question asks: "I believed I was discriminated against because of my (please circle)." In response, plaintiff checked the boxes for race, color, age, religion, disability, and national origin and ancestry. Notably, there is no box for harassment.

---

[10] The exceptions were issue 8, which argued that "plaintiff's allegations are not sufficiently severe or pervasive to constitute an actionable claim," and issue 10, which made the identical argument as to any harassment by Petersen.

[11] The order also noted, in italics yet, that the DFEH actually *"proceeded with an investigation"* of plaintiff's claims, a reference undoubtedly to a March 30, 2006 letter from DFEH discussed below. How that investigation should be considered supportive of defendants is not clear, as the details of the investigation are not in the record. The order further noted that the "investigation stopped because plaintiff demanded a 'right to sue' letter," another comment we do not understand, as a request for a right to sue letter does not defeat an employee's claim. (*Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 616 [4 Cal.Rptr.2d 640].)

However, the next question says to circle the discriminatory treatment and indicate the *date occurred*. After this question, there is an entry for "Harassed," next to which plaintiff entered "1991–2005." Then, on what is apparently the first full page of text, plaintiff said that "[t]he discrimination and harassment have been nonstop since 1991."

Plaintiff filled out a second precomplaint questionnaire on September 13, 2005. This questionnaire echoed some of the information on the earlier one, including that the harassment has been "nonstop since 1991." This questionnaire was accompanied by a typed page of "additional information," which included plaintiff's complaints that he was "overwhelmed with the unfair treatment by [his] colleagues"; that his manager did not want him to return from stress leave in management; that he had "[e]ndured relentless unfair and prejudicial treatment for years"; and that he had "always been treated unfairly during [his] employment [and] had informed H.R. on numerous occasions."

Plaintiff's first complaint for discrimination was filed with the DFEH on October 3, 2005. This complaint was prepared, according to plaintiff's testimony, by someone at DFEH. The complaint was against United only, and checked boxes for discrimination on the basis of color, religion, and national origin/ancestry.[12]

On December 26, 2005, plaintiff sent a letter to DFEH investigator Richard Swiderski, elaborating on plaintiff's position. The letter was eight pages long, single spaced, and began by thanking Swiderski for "returning my call regarding the response from United Airlines." The letter referred, among other things, to the fact that at the time plaintiff was terminated he was in active discussions "with H.R.'s Victoria Keliihoomalu" about various issues, among which was "[t]he unfair treatment [he] was receiving from [his] manager and colleagues . . . [and] [¶] . . . [¶] [t]he hostile environment [he] was working in." The letter then went on to identify 45 individuals who plaintiff asserted could shed light on various aspects of his version of facts. There is no indication in the record that anyone at DFEH ever contacted any of these people.

On March 30, 2006, DFEH wrote plaintiff of its conclusion that "the evidence and information did not support a finding that a violation of the FEHA occurred." Apparently leading to that conclusion, the DFEH's letter recited the following: "As you were informed on 03/30/2006, the investigation did not reveal sufficient evidence or information to establish that a violation of the FEHA occurred. . . . [¶] The employer presented a copy of

---

[12] According to plaintiff, he told the person filling out the form that he was retaliated against, but the person did not include this.

the notes and interview record forming the investigation in charges of sexual harassment made against you on 4/20/05 by the employee of a vendor performing services in your area of employment. The notes include a chronology of the charges and investigation, interviews with the complainant, with her supervisor, and with three witnesses together with your statements. The employer also presented a copy of a disciplinary letter and final notice dated 7/25/03 and placed in your file, and a copy of your termination letter dated 5/10/05."

On May 5, 2006, plaintiff filed two more complaints with the DFEH, one against United and one against Petersen. These complaints checked, among other things, that plaintiff was "harassed," and asserted that he "was harassed and fired in retaliation for taking medical leave and in retaliation for opposing harassment against me on the basis of my religion (Muslim), my color (dark), and my national origin (parents from Pakistan, born in Kuwait)."

On May 23, 2006, the DFEH sent plaintiff a notice of case closure because "an immediate right to sue letter was requested."

Eschewing any meaningful discussion of what was before the DFEH, defendants argued that plaintiff could rely *only* on the May 5 complaints, as only they were complaints that mentioned harassment. And, the argument ran, what was in those complaints was time-barred. The trial court bought the argument, "finding" as follows: "All of the alleged acts of harassment occurred more than one year prior to May 5, 2006, [plaintiff's harassment] claims are barred for failure to exhaust administrative remedies."

Attempting to support the trial court's holding, defendants assert five arguments here, including that (1) the precomplaint questionnaires do not make plaintiff's claims timely; (2) the factual statement in the October 2005 DFEH complaint makes no reference to being harassed; and (3) harassment is not "like or related to" discrimination. They also assert that plaintiff's failure to timely bring a harassment claim is not equitably excused and that the "continuing violation" doctrine is inapplicable. Defendants' arguments have no merit, not in the face of the record here.

■ A leading treatise describes the approach that is to be taken, doing so in the context of the analogous EEOC (Equal Employment Opportunity Commission) law: "The administrative exhaustion requirement is satisfied if the allegations of the civil action are *within the scope of the EEOC charge*, any EEOC investigation actually completed, or any investigation that might reasonably have been expected to grow out of the charge. Thus, the judicial complaint may encompass any discrimination '*like and reasonably related to*' the allegations of the EEOC charge. [Citations.] [¶] . . . Administrative

charges are to be construed liberally because they are often drafted by claimants without the assistance of counsel. Accordingly, '[i]t is sufficient that the EEOC be apprised, in general terms, of the alleged discriminatory parties and the alleged discriminatory acts.' [*Sosa v. Hiraoka* (9th Cir. 1990) 920 F.2d 1451, 1458 . . . ; see also *B.K.B. v. Maui Police Dept.* (9th Cir. 2002) 276 F.3d 1091, 1110—EEOC charges construed 'with utmost liberality'] [¶] . . . [¶] . . . Plaintiffs may proceed on claims not explicitly set forth in a charge of discrimination if the claim is 'like or reasonably related to the EEOC charges' and could reasonably be expected to *grow out of an EEOC investigation* of the charge. [Citation.]" (Chin, *supra*, ¶ 16:195 et seq., p. 16-27 (rev. # 1, .2007), some italics omitted.) Applying those principles to the setting here compels the conclusion that the trial court's decision was error. So, too, does the applicable case law.

*Baker v. Children's Hospital Medical Center* (1989) 209 Cal.App.3d 1057 [257 Cal.Rptr. 768] (*Baker*) was an action by an African-American college student who worked part time at the hospital. During the school year, he worked only on weekends, but during the summer he was "on call" for numerous shifts, and in fact worked many hours during the summers of 1982 and 1983. .However, in the summer of 1984, Baker's supervisor did not give him any additional work hours. Baker complained and filed an internal grievance in August 1984. The following May he filed his DFEH charge, claiming that he was the victim of racial discrimination during the summer of 1984. Baker's subsequent lawsuit alleged that the hospital harassed him, subjected him to disparate treatment and biased evaluations, engaged in racial epithets, denied him promotions, and stopped calling for "on-call" work shifts after he filed his grievance. (*Id.* at pp. 1060–1061.) The trial court granted summary judgment for failure to exhaust administrative remedies. Our colleagues in Division Five reversed.

The court first discussed three case: *Jones v. Los Angeles Community College Dist.* (1988) 198 Cal.App.3d 794 [244 Cal.Rptr. 37], *Sanchez v. Standard Brands, Inc.* (5th Cir. 1970) 431 F.2d 455, and *Oubichon v. North American Rockwell Corp.* (9th Cir. 1973) 482 F.2d 569. (*Baker, supra*, 209 Cal.App.3d at pp. 1062–1064.) Quoting from *Sanchez*, described as "the leading case," the court confirmed: " 'the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow. [¶] [T]he allegations in a judicial complaint filed pursuant to Title VII "may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the [EEOC]" [Citation.] In other words, the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. [¶] The logic of this rule is inherent in the statutory scheme of Title VII. A charge of discrimination is *not* filed as a preliminary to a lawsuit.

On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, [EEOC] carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC *fails* to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation.' " (*Baker, supra,* 209 Cal.App.3d at p. 1064.)

The court then concluded: "The record before us does not reveal the extent of the DFEH's investigation of appellant's complaint, or the reason it issued the right to sue letter. However, the allegations of harassment and differential treatment encompass the allegations of discrimination in his DFEH complaint. Moreover, it is reasonable that an investigation of the allegations in the original DFEH complaint would lead to the investigation of subsequent discriminatory acts undertaken by respondents in retaliation for appellant's filing an internal grievance. Consequently, we conclude the instant action is not barred by the exhaustion doctrine." (*Baker, supra,* 209 Cal.App.3d at p. 1065.)

■ We discern from the above that what is submitted to the DFEH must not only be construed liberally in favor of plaintiff, it must be construed in light of what might be uncovered by a reasonable investigation. That this is so is confirmed by a case defendants heavily rely on, *Cole v. Antelope Valley Union High School Dist.* (1996) 47 Cal.App.4th 1505 [55 Cal.Rptr.2d 443]. *Cole* was an action against the district and three administration officials, Dr. Kenneth Brummel, Darlene Hinkel, and E. Michael Rossi. Brummel and Hinkel "were not named in either the caption or the body of plaintiff's initial and amended charges filed with the [DFEH]"; Rossi was "named in the body, but not the caption, of both the initial and amended charges." (*Id.* at p. 1509.) The Court of Appeal affirmed the summary judgment for Brummel and Hinkel, but reversed as to Rossi. The reason: "If there had been an administrative investigation, Mr. Rossi would have been put on notice of the charges, and would have had an opportunity to participate." (*Id.* at p. 1511.)

Here, the matter of prelitigation investigation is a particularly pertinent one, and one distinctly favoring plaintiff. The materials he submitted to the DFEH are certainly adequate to specify the nature of his problems at the workplace. In both his questionnaires, he expressly claimed to be the victim of constant harassment: "The discrimination and harassment have been non stop since 1991 to the day my services were terminated." In both questionnaires, plaintiff used up all the available space provided. And the second questionnaire was accompanied by a typed page of "additional information," which included plaintiff's complaints that he was "overwhelmed with the

unfair treatment by [his] colleagues"; that his manager did not want him to return from stress leave in management; that he had "[e]ndured relentless unfair and prejudicial treatment for years"; and that he had "always been treated unfairly during [his] employment [and] had informed H.R. on numerous occasions." And plaintiff's lengthy December 26, 2005 letter to DFEH investigator Swiderski—sent, not incidentally, after plaintiffs' formal complaint—referred, among other things, to "the unfair treatment [he] was receiving from [his] manager and colleagues . . . [and] . . . [t]he hostile environment [he] was working in." This, we conclude, demonstrates a triable issue as to whether plaintiff exhausted his administrative remedies, a conclusion supported by the most recent United States Supreme Court case on the subject: *Federal Express Corp. v. Holowecki* (2008) 552 U.S. 389, 404 [170 L.Ed.2d 10, 128 S.Ct. 1147, 1159] (*Holowecki*).

*Holowecki* was a case brought under the Age Discrimination in Employment Act of 1967 (ADEA; 29 U.S.C. § 621 et seq.), which the district court dismissed on the ground the employee had not filed a charge with the EEOC at least 60 days before filing suit. The Second Circuit reversed, a reversal affirmed by the Supreme Court. The employee's argument in *Holowecki* was that she had filed a valid charge by "submitting EEOC Form 283," a form the EEOC labels an "Intake Questionnaire." (*Holowecki, supra,* 552 U.S. at p. 394 [128 S.Ct. at p. 1153].) Concluding that this met the ADEA test, the Supreme Court held as follows: "In this case, however, the completed questionnaire filed in December 2001 was supplemented with a detailed six-page affidavit. At the end of the last page, respondent asked the agency to '[p]lease force Federal Express to end their age discrimination plan so we can finish out our careers absent the unfairness and hostile work environment created within their application of *Best Practice/High-Velocity Culture Change.*' [Citation.] This is properly construed as a request for the agency to act." (552 U.S. at p. 405 [128 S.Ct. at pp. 1159–1160].)

So, too, the voluminous, and detailed, papers plaintiff filed here were a request for the DFEH "to act." And it is reasonable to presume that a thorough DFEH investigation would uncover a great many of the particulars of the 14 continuous years of "harassment," and "the unfair treatment [he] was receiving from [his] manager and colleagues . . . [and] . . . [t]he hostile environment [he] was working in."

But even if plaintiff's extensive submission to the DFEH were not sufficient, his claim would still be timely, saved by the continuing violation doctrine.

### 4. The Continuing Violation Doctrine

*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798 [111 Cal.Rptr.2d 87, 29 P.3d 175] involved a disabled employee who resigned from her job, but only after several years during which she claimed her employer refused to reasonably accommodate her. Many of the claimed incidents of disability occurred outside the FEHA one-year limitations period. Affirming a jury verdict for the plaintiff, our Supreme Court set forth what has come to be known as the continuing violation doctrine, holding as follows:

▆ "[W]e hold that an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment . . . is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment . . . may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. [Citation.] . . .

"Thus, when an employer engages in a continuing course of unlawful conduct under the FEHA . . . and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain." (*Richards v. CH2M Hill, Inc., supra,* 26 Cal.4th at p. 823; accord, *Dominguez v. Washington Mutual Bank* (2008) 168 Cal.App.4th 714, 721 [85 Cal.Rptr.3d 705].)

The Supreme Court has extended the continuing violation doctrine to retaliation claims. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1059 [32 Cal.Rptr.3d 436, 116 P.3d 1123].) And the doctrine also applies to racial harassment claims. (See Chin, *supra,* ¶ 16:100, p. 16-17 (rev. # 1, 2007).) Indeed, as we observed in *Morgan v. Regents of University of California, supra,* 88 Cal.App.4th 52, 65: "Cases alleging a hostile work environment due to racial or sexual harassment are often found to come within the continuing violations framework. (E.g., *Accardi v. Superior Court* [(1993) 17 Cal.App.4th 341,] 349–351 [21 Cal.Rptr.2d 292] [10-year course of sexual harassment of female police officer]; *Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1291 [261 Cal.Rptr. 204] ['campaign of retaliatory harassment' against employee who complained about employer's failure to promote her]; *Anthony v. County of Sacramento* (E.D.Cal. 1995) 898 F.Supp. 1435, 1443 ['hostile environment harassment . . . by its nature involves an ongoing course of conduct rather than a single discrete act'].)"

This is another such case, as plaintiff raised triable issues of fact on all three components: sufficient similarity; reasonable frequency; and the conduct had not acquired a degree of permanence. (See generally *Dominguez v. Washington Mutual Bank, supra*, 168 Cal.App.4th 714 [summary judgment reversed as continuing violation doctrine presented triable issues of fact as to timeliness of complaint].)

### C. *Summary Adjudication on the Discrimination Claims Was Error*

Plaintiff's third and fourth causes of action alleged discrimination, respectively in violation of FEHA and in violation of public policy and the California Constitution. Defendants sought summary adjudication on these claims in two issues (Nos. 23 & 24), on the sole basis that there was a "legitimate non-discriminatory reason for the termination." As defendants summarized their argument, plaintiff's claims are "untenable under the California Supreme Court's decision in *Cotran v. Rollings Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412] (*Cotran*). To establish 'good cause' to terminate an accused harasser under *Cotran* an employer does not need to prove that harassment actually occurred, only that it conducted an 'appropriate investigation' and that its termination decision was not 'arbitrary or pretextual.' "

■ Plaintiff argued vigorously that there was a triable issue that what occurred was pretextual. The trial court ruled against plaintiff, as follows: "Defendants have presented a legitimate non-discriminatory basis for terminating Plaintiff. Specifically his gender harassment and unwanted physical contact with the woman supervising the custodian services. (See Undisputed Material Facts Nos. 28–57.) The burden then shifted to Plaintiff to present specific detailed factual evidence demonstrating that the reason for termination was pretext and that the actual reason was discriminatory. Yet, Plaintiff failed to present any evidence controverting Material Undisputed Facts Nos. 28–57. . . . Most of the allegedly discriminatory conduct (by co-workers) occurred many years ago, and thus is remote in time from Plaintiff's termination. Further, it is Defendant Petersen who gave Plaintiff a *promotion* to supervisor."

Though the trial court never used these words, we interpret the ruling as implicitly concluding that there was no triable issue of fact as to pretext. We expressly conclude otherwise.

### 1. *The Same Actor Evidence*

■ "Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and

by the terminated employee's job performance before termination." (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479 [4 Cal.Rptr.2d 522].) In light of the fact that "identity" of the decision maker can be a criterion, and the trial court's heavy reliance on the "same actor" concept, we begin with discussion of it.

It was undisputed that Petersen was the person who terminated plaintiff. Petersen was also the person who advised plaintiff that the promotion to supervisor was being offered to him, the circumstances of which are discussed in detail below. Seizing on defendants' representation of Petersen as the promoter and then the terminator, the trial court confronted plaintiff's counsel several times about this, and the so-called "same actor."

The first instance was while counsel was arguing pretext, when the court interrupted: "[T]ermination four years later by the person who promoted him. You've got a problem with that too under the law." At another point, counsel was arguing about a claimed adoptive admission by Petersen, when the court interjected "As I promote the Muslim." Later, and still on the adoptive admission issue, the court said, "I accept it's ten years before, and you have the same after problem that your guy is promoting him. So that negates an inference of discriminatory animus under the law. So that's the problem. You want to do this adoptive admission except it's completely negated under the law by the fact that he's promoting your guy." Plaintiff's counsel responded that any such evidence can be "overridden by other facts." The court rejoined: "You have to show he is biased in the making of his decisions. Did you want to address the cases that I cited [in the tentative ruling] that talk about the same actor and that, if it is within the five-year period, that it [is] presumed not to be discriminatory?"

The order granting summary judgment discussed this at length, and how it so supported defendants. The order went so far as to refer to the "same actor presumption," and concluded that plaintiff's evidence "is not sufficient to rebut the same actor presumption, i.e., that Petersen's decision to terminate plaintiff within five years of having promoted him to supervisor is presumed nondiscriminatory."

This was wrong on several accounts, beginning with the fact that no California case or statute has created a same actor presumption.

■ We described the concept in *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798 [85 Cal.Rptr.2d 459]: " '[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.' " (*Id.* at p. 809,

quoting *Bradley v. Harcourt, Brace & Co.* (9th Cir. 1996) 104 F.3d 267, 270–271.)[13] The rationale underlying the inference, we said, is that " '[f]rom the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." ' " (*Horn, supra,* at p. 809, quoting *Proud v. Stone* (4th Cir. 1991) 945 F.2d 796, 797.)

Judicial analysis of the effect of same actor evidence has been clouded by imprecise language. For example, the Ninth Circuit has explained that "[t]he same-actor inference is neither a mandatory presumption (on the one hand) nor a mere possible conclusion for the jury to draw (on the other). Rather, it is a 'strong inference' that a court must take into account on a summary judgment motion. [Citation.]" (*Coghlan v. American Seafoods Co. LLC, supra,* 413 F.3d at p. 1098.) "[W]hen the allegedly discriminatory actor is someone who has previously selected the plaintiff for favorable treatment, that is very strong evidence that the actor holds no discriminatory animus, and the plaintiff must present correspondingly stronger evidence of bias in order to prevail." (*Id.* at p. 1096, fn. 10; see also *Bradley v. Harcourt, Brace & Co., supra,* 104 F.3d at p. 271 ["strong inference"].)

Presumptions and inferences, though similar, are distinct. The Evidence Code defines a *presumption* as "an assumption of fact that the *law requires to be made* from another fact or group of facts . . . established in the action." (Evid. Code, § 600, subd. (a), italics added.) Presumptions may be created by case law as well as by statute. (2 Jefferson, Cal. Evidence Benchbook (4th ed. 2009) Presumptions, § 48.2, p. 1108.) But, as noted, no California case or statute has created a same actor presumption.

An *inference,* on the other hand, is driven by logic, not law. It "is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts . . . established in the action." (Evid. Code, § 600, subd. (b).) Clearly, same actor evidence will often generate an inference of nondiscrimination. But the effect should not be an a priori determination, divorced from its factual context. Nor should such evidence be placed in a special category,[14] or have some undue importance attached to it, for that could threaten to undermine the right to a jury trial by improperly easing the burden on employers in summary judgment.

---

[13] This concept has also been applied where the putative discriminator promoted the plaintiff before taking adverse action against him. (See *Coghlan v. American Seafoods Co. LLC* (9th Cir. 2005) 413 F.3d 1090, 1097–1098.)

[14] Some courts have held that the fact the same actor conferred an employment benefit on an employee before discharging that employee is simply evidence and should be treated like any other piece of proof. (*Waldron v. SL Industries, Inc.* (3d Cir. 1995) 56 F.3d 491, 496, fn. 6.)

In any event, any same actor evidence could not avail defendants here, not in light of the complete picture concerning plaintiff's promotion, which is this.

Plaintiff applied for the supervisor position in June 2001, when he was told by then supervisor Dennis Thomas that he would be leaving the department. Plaintiff completed the necessary paperwork, and a day or two later was told by a coworker that Petersen had already offered the job to a Caucasian employee, John Bagala. Plaintiff immediately complained to Sharon Barncord, a human resources employee, about what he perceived to be the unfair selection process. Then, on July 2, plaintiff met with Barncord, Amaury Colon, senior staff representative for equal employment opportunity compliance, and Asfaha, to discuss his concerns that "as an employee of color, [he] would never have a chance to become supervisor in . . . Petersen's circle of supervisors of mechanics."

Whatever then happened internally at United is not in the record, but on July 5, 2001, plaintiff was interviewed for the supervisor position, meeting with Petersen, Barncord, and another employee named Steve Picnie.[15]

On July 17, while in a staff meeting, plaintiff received a telephone call from Barncord, who asked if he had talked to Petersen. Plaintiff said he had not, and Barncord said she wanted to speak to him after the meeting, but she was running late. According to plaintiff, when Petersen saw him speaking on the telephone, he stared at him. Plaintiff explained that he was speaking to Barncord, upon which Petersen ordered plaintiff into his office. Then, "[a]fter loudly and rudely slamming his office door shut," Petersen asked plaintiff in an angry tone of voice, "What is going on here?" Plaintiff said he was talking to Barncord, at which point Petersen instructed him to return to the conference room. Barncord arrived sometime later, and Petersen asked her into his office where they had a long discussion, after which they joined the staff meeting.

When the meeting ended, Barncord told plaintiff that Petersen "is going to talk to you about the same thing I was." Plaintiff went to Petersen's office and Petersen, "in a cold and hostile tone," said to him, "The job is yours if you want it." Petersen said nothing to congratulate plaintiff, nothing encouraging or at all positive.

Plaintiff did not accept on the spot. Rather, he talked to Banford, the director of human resources, Barncord, and Asfaha. Plaintiff expressed reservations about accepting the supervisor job and losing the protections afforded

---

[15] According to plaintiff, at the end of the interview Picnie said to him, "I have heard about you." Plaintiff's response was that he hoped he had heard good things. Picnie did not respond.

him as a union member because he was afraid he would be treated unfairly by Petersen and the other White supervisors in the facilities maintenance department.

On July 19, 2001, plaintiff again spoke to Barncord and Asfaha, including about what he referred to as "the discriminatory and harassing treatment [he] had already been subjected to." As plaintiff tells it, Barncord and Asfaha encouraged plaintiff to "put aside past racial issues and to accept the team leader/supervisor position in facilities maintenance."

Human resources director Banford later called plaintiff at home to discuss the supervisor position. Plaintiff told her he was afraid that if he accepted the position, Petersen would create a reason to fire him. Banford encouraged plaintiff to take the job, saying she wanted him "to be the 'Jackie Robinson' of the facilities maintenance department and bring about desired changes." Banford also promised plaintiff he would have the support of the human resources department to succeed in the position.

On July 19, plaintiff told Petersen that he would take the position. Petersen replied by simply saying, "O.K." Again, he said nothing to congratulate plaintiff, nothing welcoming.

But there is even more to it than that, as developed out of Petersen's own mouth, whose deposition testimony calls into question whether Petersen *was even the person who made the decision to offer the promotion to plaintiff*. Petersen testified that there was some "conversation" concerning the promotion to the supervisor position, and that one of the people who participated was Wysong, his "immediate supervisor." Petersen admitted that Wysong said "something to the effect that it would be a good idea to select [plaintiff] to become supervisor of plant maintenance, because there were so many white folks with that job." And when it came to decide which person should be offered the promotion, Wysong was, Petersen admitted, "the tie breaker" in favor of plaintiff.[16] That was the evidence on the promotion end of the single actor concept.

On the other end, and as discussed at length above, all along plaintiff complained to Petersen about the way he was being treated. More significantly, plaintiff complained about Petersen, complaining all the way to world headquarters. There are, to be sure, inferences that can be drawn from Petersen's involvement here. Two immediately come to mind: Petersen

---

[16] This nuanced testimony is in sharp contrast to the late-filed Petersen declaration where he pointblank testified that "I made the decision to promote" plaintiff. Such discrepancy shows just how hazardous—and how improper—is the deciding of facts based on what is said on paper, without the benefit of demeanor, not to mention cross-examination.

(1) never wanted to promote plaintiff in the first place and (2) could not wait to get rid of him in the second. This second inference is buttressed by the facts leading to plaintiff's termination, especially the "investigation" into the incident that precipitated it.

### 2. The Incident and the "Investigation"

As noted, plaintiff was terminated on May 9, 2005, because of an incident on March 25, 2005. The complete description of this incident in defendants' brief is as follows: "On March 25, 2005, Nazir had an altercation with Iris Avellan, a supervisor with Scientific Concepts, a contractor providing janitorial services to United. As described in Avellan's later written complaint, Nazir 'began asking [Avellan] when [she] was going to send a lady over to clean [Nazir's] office.' When Avellan asked why a male janitorial employee, named Irwin, could not clean Nazir's office, Nazir said, 'he didn't like the way Irwin smelled and that Irwin doesn't wear high heels.' Avellan asked Nazir 'if he was looking for a cleaner or a date.' Nazir then 'changed the conversation to talk about [Avellan's] personal life.' After Avellan told Nazir that she was uncomfortable talking about her personal life, Nazir told Avellan that she 'needed to talk with [her] boyfriend' and that she needed 'to stop being so evil, coniving [sic], manipulating, and tough.' Nazir asked Avellan if she thought she was 'tough,' and suddenly grabbed Avellan's hand and 'quickly slammed [her] hand and arm on the table.' After Avellan told Nazir that she could call his boss and tell him what he was doing, Nazir 'push[ed] his cell phone at [Avellan] saying, "Here, go ahead, go ahead, call him, call him." ' " (Citations omitted.)

The termination was confirmed by Petersen's letter of May 10, which reads in pertinent part as follows:

"Dear Iftikhar,

"On Monday, May 9, 2005, a meeting was held in my office. In attendance were you, Ron Rich and myself. The purpose of the meeting was to deliver the findings of the Harassment and Discrimination investigation that began on April 20, 2005. [¶] On April 20, 2005, United Airlines received a complaint of alleged behavior . . . . After receiving the complaint, we conducted a prompt and thorough investigation . . . . Our investigation revealed that you, in fact, made statements that were directed at the female gender. It was also found that you made several comments that were inappropriate, offensive and of a personal nature even after being told that the individual was uncomfortable talking about her personal life. It was also found that you grabbed the arm of the individual, slamming it to the table. . . . [¶] . . . [¶] Based on the above findings, a review of your overall performance, and active Final Notice

in your personnel file, the decision has been made to separate you from United Airlines effective May 9, 2005."

A "prompt and thorough investigation," Petersen wrote, which investigation "found" among other things that plaintiff "grabbed the arm of the individual, slamming it to the table." Maybe a jury will reach those conclusions. Maybe not. They are certainly not indisputably shown in the record here, not by a long shot.

United has extensive rules and policies about the investigation of complaints. One fundamental policy states that if "there is *any* reason you would *not* be perceived as an *unbiased* investigator, *choose another investigator*." Despite that, and in the face of the evidence described above, Petersen was to lead the investigation. Ronald Rich was to assist. Rich described himself as a labor relations person who had been assigned to assist Petersen in the facilities maintenance department. He attended most staff meetings in Petersen's department in 2005, and considered Petersen to be "an internal customer" of his, a person he served.

These, then, were the persons to lead the United investigation, a person who at least inferentially had an axe to grind, assisted by someone who "served" him. Such an investigation can itself be evidence of pretext. As one Court of Appeal described it, such investigation could "exploit[] a disciplinary process predisposed to confirm all charges." (*Reeves, supra,* 121 Cal.App.4th at p. 120.) And confirm it did, in an "investigation" that can hardly be called "thorough."

As noted, the incident with Avellan occurred on March 25. Avellan did not even complain to anyone about anything for a week or more, and apparently not until plaintiff complained to Avellan's boss about her company's performance. Avellan then went to her boss, Carlos Palacios, who then involved Mike Flanigan. And it was Flanigan—who, as will be seen, himself had issues with plaintiff—who asked Avellan for her statement.

Avellan's "later written" (as defendants call it) statement was in fact not prepared until almost a month after the incident. It was three pages in total, the first two of which were hand-printed, and began in pertinent part as follows:

"April 20, 2005

"To: Mike Flanigan, Mgr. Scientific Concepts

"From: Iris Avellan, Swing Shift Supervisor

"Re: Activity during Good Friday Swingshift Operations

"(Inappropriate behavior)

"This statement is being prepared at the request of my manager Mike Flanigan."[17]

Avellan's statement, it developed, was not written by Avellan herself. Rather, the first two pages were printed by Bill Knight, a security supervisor at United who was Avellan's "boyfriend." The third page was prepared by a fellow student at the evening school Avellan attended.

That was the background against which Petersen and Rich began their investigation at the heart of defendants' position, which position places heavy reliance on *Cotran v. Rollings Hudig Hall Internat., Inc., supra,* 17 Cal.4th 93 (*Cotran*), a case defendants cite for the proposition that an adequate workplace investigation "does *not* need to mirror the type of factual inquiry or procedure found in litigation." Maybe not. But *Cotran* hardly supports defendants. *Cotran,* an appeal following a *jury trial,* set forth three elements for determining good cause in termination decisions, the second of which was whether the termination followed " 'an appropriate investigation and [was] for reasons that are not arbitrary or pretextual . . .' "—an element the Supreme Court expressly observed was "triable to the jury." (17 Cal.4th at pp. 107–108.)

Defendants also rely here, as they did below, on *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256 [76 Cal.Rptr.2d 382], a case which affirmed a

---

[17] As pertinent here, the text of Avellan's statement includes the following:

"Iftikhar then changed the conversation to talk about my personal life. I told him I was uncomfortable talking about that. Iftikhar then told me that I needed to talk with my boyfriend. He told me that I need to stop being so evil, conniving, manipulating, and tough. At this time I asked him if I should thank him or if I should slap his face. Iftikhar then asked me if I thought I was tough, and grabbed my hand and quickly slammed my hand and arm on the table, in the conference room where we were talking.

"I told Iftikhar that I could call his boss and tell him what he was doing. He was pushing his cell phone at me saying, 'Here go ahead, go ahead, call him, call him.'

"Iftikhar called Carlos Palacios and told him that he doesn't want to deal with me anymore. He told Carlos that his office was a mess and that I wasn't doing my job. As I had explained to Iftikhar many times in the past, Bldg. 84 is not my area of responsibility, it is Leroy Coleman's area. Being short on people with such a large area to take care of myself, I couldn't drop what I was doing and send someone to clean his office, especially when he was requesting a lady. I asked Iftikhar if he was looking for a cleaner or a date.

"A few days later I and one other lady went up to clean his office at the request of my manager Carlos Palacios. Carlos told me that Iftikhar had been calling him at home complaining about me, and that he was requesting to have a lady clean his office at least twice a week. Iftikhar seemed to be pleased with the results he accomplished."

summary judgment against a 28-year employee who was terminated following reports by two female employees that Silva had sexually harassed them—a case defendants described as "another case with facts remarkably similar to those here." The investigation in *Silva* was by a well-trained human resources representative, who had no connection with the accused employee. The investigator carefully followed Lucky's written policy, and interviewed no fewer than 15 employees during a month-long investigation. And in doing all that, the investigator asked, "relevant, open-ended, non-leading questions." (*Silva v. Lucky Stores, Inc., supra*, 65 Cal.App.4th at p. 272.) As will be seen, the investigation here was a far cry, raising a triable issue whether the investigation was, in the language of *Cotran*, "appropriate."

Claiming that the investigation here necessarily measured up, apparently as a matter of law, defendants argue that "Here, the requirements for investigative fairness in a workplace setting were met. . . . United's investigators met with both Avellan and Nazir, and learned each side's version of what happened. Nazir was orally advised of the charges against him, and given an opportunity to provide a written response to those charges, which Nazir did. United also interviewed the only eyewitness to the incident, Coleman (who is not claimed to have harbored any bias against Nazir), who corroborated Avellan's version of the incident." Defendants' brief goes so far as to assert that "During United's investigation into an ensuing complaint brought against Nazir by the woman and her company, an *independent eyewitness* to the event confirmed that this physical contact was unwelcome, and was *not* consensual arm wrestling as Nazir claimed." Defendants' assertion to the trial court was perhaps even bolder: "Avellan's sexual harassment complaint against Nazir was not only corroborated by an independent eyewitness, the termination decision was based upon Nazir's written statement in which he admitted the conduct outright or, at least did not deny that it occurred."

The trial court bought into this claimed version of facts wholeheartedly, as shown by the colloquy at argument and the court's one-sided description of what it understood occurred, as will be discussed below. It was also shown in the order itself, "finding" that defendants presented a nondiscriminatory basis for the termination, "[s]pecifically [plaintiff's] gender harassment and unwanted physical contact with" Avellan.[18] But the evidence would support an entirely contrary version of this incident, a version that says what happened may not have been unwanted, a version that says the "eye-witness" corroborated plaintiff, not defendants—indeed, that Avellan herself corroborated plaintiff. There is a triable issue of fact as to pretext.

---

[18] Defendants call the incident with Avellan "sexual harassment"; the court called it "gender harassment." The record belies the labels. Rich admitted that Avellan never said that plaintiff ever tried to do anything sexual to her, or that he even discussed anything of a sexual nature. And Avellan never said that plaintiff's conduct had anything to do with the fact she was a woman.

United's policy expressly provides that a written complaint against an employee will be provided to the alleged harasser. Despite that, no written statement was given to plaintiff.[19] Plaintiff was nevertheless asked to provide his own written statement, based on what Petersen and Rich told him were Avellan's accusations. Plaintiff did so, explaining the "context" of his request for a female cleaning person. He also admitted that he had talked to Avellan about a marriage proposal, which he knew about because Knight, Avellan's boyfriend, the marriage proposer, told him. And plaintiff also explained his version of what occurred, a version that had three fundamental components: (1) Flanigan of Scientific Concepts was behind Avellan's complaint, as he had a reason to retaliate against plaintiff because he had complained earlier to Petersen that Flanigan's employees were not given adequate supplies to do their jobs; (2) what occurred vis-à-vis Avellan was not unwelcome; and (3) the "arm on the table" was in the course of "arm wrestling."

Plaintiff met with Petersen and Rich on April 25, 2005, and among other things asked them to interview several people he believed would "have evidence that would help" him. He specifically identified Knight, Avellan's boyfriend, and the person who in fact prepared her printed statement. He also identified at least two other employees. None of the requested interviews was ever done.

 Petersen and Rich were asked about this, and the reason they did not interview even Knight. Rich said it was because Knight "was not present at the incident"; Petersen said because Knight "was not part of [what] took place." However, they did interview Palacios and Flanigan, despite that they were not at the incident either. An employer's failure to interview witnesses for potentially exculpatory information evidences pretext. (*Reeves, supra*, 121 Cal.App.4th at pp. 120–121; *Greene v. Coach, Inc.* (S.D.N.Y. 2002) 218 F.Supp.2d 404, 410; *Probst v. Reno* (N.D.Ill. 1995) 917 F.Supp. 554, 561.)

Petersen and Rich did interview Avellan about the incident, and both made notes of that interview. Rich was questioned about his notes of that interview, which included this entry: "in the beginning [it] may be a joke." Avellan also told Rich that when plaintiff first talked to her about her personal life, she "was laughing." And, of course, the interview included the subject of "arm wrestling," a game which begins with the contestants' elbows on a table or

---

[19] Nor did United ask Avellan to complete the form its policy mandated or otherwise answer the supposedly mandatory questions in writing. Mandatory questions include the type of discrimination claimed; why the complainant believed the conduct was motivated by discrimination; what "exact words" were objectionable; what "exact conduct" was objectionable; "exactly how you were touched"; "[e]xactly what did you say or do" to object; and who was told about the incident. In fact, United did not even obtain verbal answers from Avellan to these questions.

other flat surface. Asked at deposition about this in light of what was in Avellan's statement, Rich admitted "it's possible that elbows could have been on the table." After all, Avellan never said where her elbows were, and Rich did "not specifically" ask whether "she was trying to slam [plaintiff's] hand to the table."

But beyond what was "possible," Rich was asked to read his notes of the interview with Avellan on this subject. This is what he read:

"A: 'Good Friday. He said he was Pakistani. My grand dad was from the Middle East. If you think you're strong show me.' And then I think she was gesturing toward arm wrestling. I don't recall exactly."

This questioning by plaintiff's counsel followed:

"Q: What did you actually write down?

"A: I wrote in parentheses, I wrote down, 'arm wrestle.' I don't believe she said that word.

"[¶] . . . [¶] Q: So does this read, 'but if you think you're strong—show me and (arm wrestle)'?

"A: That's what it says.

"Q: And is that what Iris Avellan said that Iftikhar Nazir told her?

"A: Most of it. The in paren, the 'arm wrestle' was my own interpretation. That was me."

Counsel for plaintiff followed up:

"Q: Why did you write down the . . . two words, 'arm wrestle' in your notes regarding Question 3?

"A: There must have been something that simulated arm wrestle, but I don't recall what it was.

"Q: Okay. So Iris Avellan did something to simulate arm wrestling after she said the words in the interview . . . to the effect 'but if you think you're strong show me and'?

"[¶] . . . [¶] A: I would say at this point in time that was my assumption.

"Q: Okay. That's what you observed, you were there, right? . . .

"[¶] . . . [¶] A: I observed it, yes."

So, Rich observed Avellan simulate arm wrestling, corroborating plaintiff's story. And this is exactly what Petersen and Rich were told by Coleman, the other person present on March 25—the "eyewitness" defendants boldly told the trial court "corroborated" the "sexual harassment complaint" against plaintiff. If what Coleman said was "corroboration," it comes in a novel guise, as described by Rich himself:

"Q: All right. So one of the questions that Mr. Petersen asked Leroy Coleman in the interview of Mr. Coleman was for Mr. Coleman to describe what took place when Iftikhar Nazir took Iris Avellan's hand to the table; is that correct?

"[¶] . . . [¶] A: Yes, seems to be the question he asked.

"Q: Okay. And in response to that question, one of the things that Mr. Coleman said was that what happened was like arm wrestling, correct?

"[¶] . . . [¶] A: He says he grabbed her wrist and put it down like arm wrestling. That it was like arm wrestling and that there was no challenge from Iris. So I think I'm trying to give us a better picture of what it was like. He grabbed her wrist and he put it down on the table. So he grabbed it and put it on the table as if it could have been arm wrestling."[20]

But the investigators had more. On April 29, 2005, United employee Chet Wing provided a written statement to Rich, setting forth interactions he had had with Avellan, which began when he reported a tripped circuit breaker. Wing's statement related a conversation with Avellan in which she told him plaintiff "arm wrestled her." Neither Petersen nor Rich followed up on this, not even asking Avellan about it.

And to cap it all off, there is the deposition testimony of Avellan herself, which was this:

"Q: When was it you first found out what arm wrestling is?

"A: Just like . . . I mean when they ask me about that case, that Mr. Nazir start, you know, fighting, the—that the word comes . . . how do you say, arm les—

---

[20] Petersen wrote this description of Coleman's response: "I took it like they were joking."

"Q: Wrestling?

"A: Wrestling? Yeah. I guess he say something like that that night, but I didn't really—I—I—I didn't understand.

"Q: Who said something about arm wrestling?

"A: Mr. Nazir, the night.

"Q: And that was March 25th, 2005?

"A: Yes.

"Q: And it was during the time that you, Lee Roy [*sic*] Coleman, and Iftikhar Nazir were together that Mr. Nazir said something about arm wrestling?

"A: Yes."

 Proof of discriminatory intent often depends on inferences rather than direct evidence. (*Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1386 [96 Cal.Rptr.2d 236].) And because it does, "very little evidence of such intent is necessary to defeat summary judgment." (*Nadof-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 991 [83 Cal.Rptr.3d 190].) Put conversely, summary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff. (*Spitzer v. Good Guys, Inc., supra*, 80 Cal.App.4th at p. 1386; see generally *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470 [30 Cal.Rptr.3d 797, 115 P.3d 77].) There was plenty of evidence here. The trial court just did not see it.

We earlier quoted one experienced superior court judge's admonition that the worst of the fatal errors counsel could commit would be to "attempt to 'hide' triable issues of [material] fact." (Brenner & March, *Use and Abuse of MSJs: A View from the Bench, supra*, 49 Orange County Law. at p. 37, boldface omitted.) Our late colleague Justice John (Dick) Benson discussed this in some detail, in *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1 [272 Cal.Rptr. 227]. Justice Benson, who had been a renowned trial attorney and then a distinguished trial court judge for many years, was commenting on the papers filed by what was then a large San Francisco law firm, papers for which the firm had been sanctioned by the trial court. This is what he said:

"Brobeck asserts the trial court did not make a finding that the opposition to the statement of undisputed facts was filed for the purpose of deceiving the

court and this court cannot draw such an inference. Brobeck is incorrect. The trial court specifically found the pleading to be filed in bad faith and to be frivolous. Indeed, it was. Brobeck's prepared response in opposition to Folsom's revised statement of undisputed facts is, in many respects . . . , no more than an indiscriminate assemblage of a mass of documents having little or no bearing on the discrete issues raised. It is a deliberate, patent effort at obfuscation intended to overwhelm the trial judge charged with responsibility to determine fairly and impartially whether triable issues of fact exist. Sadly, it is a tactic too often employed in civil litigation, calling for an exorbitant expenditure of judicial time to sift through bales of irrelevant information in an attempt to glean a kernel of substance. It is a game the judicial system can no longer afford to play, if it ever could." (*580 Folsom Associates v. Prometheus Development Co., supra*, 223 Cal.App.3d at pp. 25–26.)

While this is not a sanctions case, and while the trial court made no finding about defendants' papers, we are obviously troubled by them, and the misleading picture they presented, a picture that obviously led to the erroneous ruling here. The trial court's comments about, and descriptions of, the subject of Avellan's arm on the table—comments made in the face of all the evidence set forth above—graphically make the point.

At one point plaintiff's counsel was attempting to argue that eyewitness Coleman's version of the incident could be said to support plaintiff, when this exchange occurred:

"The Court: Well, he is not allowed to do that. He is not allowed to grab this woman and slam her arm down onto the table, right?

"Mr. Horowitz: If he believed that this was consensual arm wrestling—

"The Court: On the contrary. You keep missing the point. If he is grabbing the woman and doing this to her in the context of employment, his intent is irrelevant under the law. What matters is what objectively happened . . . ."

At another point, the court said, "What is the piece of evidence that says it's consensual when she said that it wasn't and the person who saw it happen said that there was nothing to indicate that it was consensual." Plaintiff's counsel attempted to respond, and the court said: "You seem to miss the point though. The fact is they actually did an investigation, and he was terminated on the basis of the investigation. . . . [¶] He grabbed this woman, and she said, and there is no contrary evidence, that he grabbed her and he slammed her arm on the table, and that she was not happy about that, and she was not inviting it, and she was not willing to do that. There is no contrary evidence presented by you."

The court gave even more colorful descriptions at a later hearing on plaintiff's motion for new trial, referring to plaintiff's "manhandling of her," and how he "physically assaulted the woman." Confronted by plaintiff's counsel that such description could be accurate only if the court believed defendants' version of events, the court responded that plaintiff "grabbed her arm and smacked it to the table."[21]

Our Supreme Court has explained that "The purpose of the 1992 amendment was 'to move summary judgment law' in this state 'closer' to its 'federal' counterpart as clarified in *Celotex, Anderson,* and *Matsushita,* in order to liberalize the granting of such motions. [Citation.] The purpose of the 1993 amendment was to move it even closer. [Citation.] . . . [¶] Together the 1992 and 1993 amendments, which continue in effect to this day, have ' "changed" ' summary judgment law ' "dramatically." ' [Citations.]" (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 848, fns. omitted.)

As a result of such liberalization, that dramatic change, trial courts began to grant summary judgments more frequently, which has been described as having a salutary effect, ridding the courts of cases truly lacking in merit. And many employment cases fit that description, with some counsel too often

---

[21] The trial court drew a similarly inaccurate picture of what occurred in connection with plaintiff's dealings with the DFEH, which we have described at length, including plaintiff's references to "harassment," his detailed eight-page letter to the investigator, and all else. The court saw it differently, as shown by these two examples:

At one point, plaintiff's counsel referred to the words "harassed" in the first questionnaire, and plaintiff's statement that the "discrimination and harassment has been non-stop since 1991." The court first responded that "[c]aselaw says he has to give some sort of particulars or specificity. I didn't notice any details, particulars or specificity. The law says you can't just say hi, I was harassed, goodbye."

At another there was this colloquy:

"Mr. Horowitz [counsel for plaintiff]: In the complaint, that is pretty much what happens. There is only a line space for maybe four or five lines on the actual complaint to describe what happens. And typically, there is very, very little ever put in there.

"The Court: Well, you know, that's not the ones that I've seen filed. I mean, you normally give as much factual detail as you can so that nobody comes to court when you file your lawsuit and says, well, you never brought that up with the government. You normally try to be as detailed as possible.

"Mr. Horowitz: Well, actually, the complainant has no control over the actual complaint. Those are prepared by the Department of Fair Employment and Housing.

"The Court: That's not true. You can fill it out yourself."

The court's last observation, we are constrained to note, was despite plaintiff's express testimony that someone at the DFEH prepared the complaint. It is also contrary to the DFEH's own Web site, which says that "[t]he interviewing Consultant drafts a formal complaint on the DFEH's standard form. It is signed and served on the Respondent." (Cal. Dept. of Fair Employment & Housing, Employment Complaint Process <http://www.dfeh.ca.gov/DFEH/Complaints/eCompProc.aspx> [as of Oct. 9, 2009].)

willing to file suit whenever an employee in a protected class suffers some adverse employment decision. Such cases should be disposed of as quickly and efficiently as possible.

On the other hand, since the summary judgment procedure has been removed from disfavored status, some judges and commentators have expressed concern that trial courts have moved too far in the other direction. (E.g., Wald, *Summary Judgment at Sixty* (1998) 76 Tex. L.Rev. 1897 (Wald); Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?* (2003) 78 N.Y.U. L.Rev. 982.) And much of this concern has been expressed in particular reference to employment cases. (Beiner, *The Misuse of Summary Judgment in Hostile Environment Cases* (1999) 34 Wake Forest L.Rev. 71 (Beiner).)[22]

■ We take no position on this criticism, but do observe that many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper. Such cases, we caution, are rarely appropriate for disposition on summary judgment, however liberalized it be.[23] In the colorful language of Chief Judge Wald: "Its flame lit by *Matsushita, Anderson,* and *Celotex* . . . summary judgment has spread . . . through the underbrush of undesirable cases, taking down some healthy trees as it goes." (Wald, *supra,* 76 Tex. L.Rev. at p. 1941.) This, we cannot allow.

D. *Summary Adjudication As to the Retaliation Claim Was Error As to United*

■ Government Code section 12940, subdivision (h) provides that it is an unlawful employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed

---

[22] As early as 1993, one scholar examined the summary judgment procedure in title VII and age discrimination cases, and concluded that courts in such cases weigh the evidence, frequently draw inferences in favor of the moving party employer, and seemingly make credibility determinations. (McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases* (1993) 34 B.C. L.Rev. 203, 229.) Similar criticism has continued over the years. (See Beiner, *supra,* 34 Wake Forest L.Rev. 71; Colker, *The Americans with Disabilities Act: A Windfall for Defendants* (1999) 34 Harv.C.R.-C.L. L.Rev. 99, 101–102; Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, supra,* 28 N.Y.U. L.Rev. 982, 1064; Burbank, *Vanishing Trials and Summary Judgment in Federal Civil Cases: Drifting Toward Bethlehem or Gomorrah?* (2004) 1 J. Empirical Legal Studies 591, 624.)

[23] The leading practical treatise for California federal procedure goes so far as to state that "Disputes as to the employer's motives or state of mind raise factual issues, precluding summary judgment. [Citations.]." (Schwarzer et al., Cal. Practice Guide: Federal Civil Procedure Before Trial (The Rutter Group 2009) ¶ 14:280, p. 14-81 (rev. # 1, 2009).)

any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." "Employees may establish a prima facie case of . . . retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." (*Miller v. Department of Corrections, supra*, 36 Cal.4th at p. 472, citing *Flait v. North American Watch Corp., supra*, 3 Cal.App.4th at p. 476.)

Plaintiff alleged three causes of action for retaliation, as to which the trial court ruled as follows: "As to plaintiff's claims of retaliation, alleged as the fifth, sixth, and ninth causes of action, Defendants have made a prima facie showing of a legitimate non-discriminatory reason for terminating Plaintiff, which Plaintiff has failed to rebut by a prima facie showing of pretext and that the real reason was in retaliation. Thus, Defendants would be entitled to summary adjudication of these claims."

■ This, too, was error, in light of our conclusion as to pretext. Likewise in light of our Supreme Court's observation that "Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. . . . [T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." (*Yanowitz v. L'Oreal USA, Inc., supra*, 36 Cal.4th at p. 1052.)

That context, those unique circumstances, are discussed in detail above. Plaintiff had complained for years about numerous things—to Petersen and about Petersen. Such complaints are considered sufficient opposition to trigger the prohibition against retaliation. (*California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1018 [18 Cal.Rptr.3d 906]; *Passantino v. Johnson & Johnson Consumer Products, Inc.* (9th Cir. 2000) 212 F.3d 493, 506 [formal or informal complaints to supervisor].) Plaintiff goes on stress leave, and prior to his return Petersen asks him to voluntarily demote himself to mechanic. Plaintiff refuses and returns to work, to complain yet again, and be harassed yet again. And three weeks later he is fired, following a less-than-thorough investigation.

■ Summary adjudication on the retaliation claims is reversed as to United. There is, however, no individual liability for retaliation (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173 [72 Cal.Rptr.3d 624, 177 P.3d 232]), so the summary adjudication of these claims in favor of Petersen is affirmed.

E. *Summary Adjudication of the Failure to Prevent Discrimination and Harassment Claim Was Error*

■ "The employer's duty to prevent harassment and discrimination is affirmative and mandatory." (*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035 [127 Cal.Rptr.2d 285].) Plaintiff's seventh cause of action alleged breach of that duty. Defendants' motion sought summary adjudication on the sole basis that there was no harassment or discrimination, which the trial court granted. In light of our conclusions regarding harassment and discrimination, summary adjudication of this cause of action must be reversed.

F. *Summary Adjudication of the Infliction of Emotional Distress Claim Was Error*

■ Plaintiff's 14th cause of action alleged intentional infliction of emotional distress. A claim for distress arising out of employment is "not barred where the distress is engendered by an employer's illegal discrimination practices." (*Accardi v. Superior Court, supra,* 17 Cal.App.4th at p. 352; accord, *Watson v. Department of Rehabilitation, supra,* 212 Cal.App.3d 1271, 1286.) Neither discrimination nor harassment is a normal incident of employment. (E.g., *Jones v. Los Angeles Community College Dist., supra,* 198 Cal.App.3d 794, 805; Chin, *supra,* ¶¶ 15:585 to 15:586, pp. 15-71 to 15-72, and authorities cited.) Again, our conclusions as to the discrimination and harassment claims compel reversal of the summary adjudication of this cause of action.

G. *Summary Adjudication Was Properly Granted on the Eighth, 12th, and 13th Causes of Action*

1. *The Eighth Cause of Action*

The eighth cause of action was styled "discharge because of history of disability or perceived disability." Defendants sought summary adjudication on the basis that plaintiff could not show he was terminated "because of an actual or perceived disability." Plaintiff's opposition brief below did not address this issue, nor does his brief before us. We thus treat this cause of action as waived.

2. *The 12th and 13th Causes of Action*

Plaintiff's 12th and 13th causes of action alleged respectively fraud and battery. Both claims arose, in the words of plaintiff's brief, "from Petersen's

conduct tricking [plaintiff] into eating pork, knowing this would violate [plaintiff's] Muslim religion."

Defendants argued that plaintiff had "no admissible evidence that the dish contained pork [as] his belief that the dish had pork is based upon the hearsay statement of the 'chef.' " Defendants also asserted that plaintiff's only claimed damage from his claimed discovery that the dish contained pork was that he felt "physically ill." The trial court granted summary adjudication on these claims on two bases: (1) the only claimed damages were physical and emotional injuries and distress; and (2) the only evidence that it was pork is hearsay allegedly from the statement of an unidentified chef. We agree with the second basis.

Defendants' moving papers demonstrated that the only evidence of an essential component of his claims—that the food contained pork—was from plaintiff, and that his testimony in this regard was hearsay. (See *Rio Linda Unified School Dist. v. Superior Court* (1997) 52 Cal.App.4th 732, 741 [60 Cal.Rptr.2d 710].) Plaintiff thus had to present admissible evidence as to this critical element. He did not, asserting only that he knew there was pork because the dish had a "smoky taste." Such speculation is not evidence. (*Buehler v. Alpha Beta Co., supra,* 224 Cal.App.3d 729, 734; *Hoover Community Hotel Development Corp. v. Thomson, supra,* 167 Cal.App.3d at pp. 1136–1137.) Summary adjudication on these two causes of action was proper.

### H. *Some Concluding Thoughts*

We have referred to the misleading picture painted by the mass of paper before the trial court, and to the error that resulted. And the two are undoubtedly related, as what apparently happened is that the trial court did not read all the papers, shown, for example, by the facts that it sustained "objections" to evidence where no objection was set forth and saw a "physical assault" of Avellan despite all the evidence of "arm wrestling." While not reading the papers cannot be condoned, it can perhaps be understood, as we hesitate to speculate how long it would take a trial court to meaningfully digest over 2,200 pages of separate statements, analyze and rule on 764 objections set out in 325 pages, review it all in light of the applicable law, and then write a proper order.

The incredible volume of material here simply has no place in a system where overburdened trial courts labor long and hard. Thus, we conclude with some guidance in the event a trial court is ever again confronted with anything remotely close to that here.

As early as 1940 our Supreme Court observed that "There is nothing novel in the concept that a trial court has the power to exercise a reasonable

control over all proceedings connected with the litigation before it. Such power necessarily exists as one of the inherent powers of the court and such power should be exercised by the courts in order to insure the orderly administration of justice." (*Hays v. Superior Court* (1940) 16 Cal.2d 260, 264 [105 P.2d 975].)

"The trial court's inherent powers have been recognized, endorsed and affirmed in a considerable body of authority, and the powers have been flexibly applied in response to the many vagaries of the litigation process." (*Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 287 [245 Cal.Rptr. 873].) Thus, the power has been put to use in the discovery process (*Hays v. Superior Court, supra*, 16 Cal.2d at p. 264), and at trial (*Estate of Wineteer* (1917) 176 Cal. 28, 30–31 [167 P. 516] [inherent power to limit the introduction of cumulative evidence]; Annot., Limiting Number of Noncharacter Witnesses in Civil Case (1966) 5 A.L.R.3d 169 [to limit the number of witnesses in a civil case]). And such inherent power has been used in the summary judgment context as well. (See *Security Pacific Nat. Bank v. Bradley, supra*, 4 Cal.App.4th at p. 92 [after first denying summary judgment because motion was not in proper form, trial court gave counsel " 'course on summary judgment' " and then ordered that motion could be refiled]; *Collins v. Hertz Corp., supra*, 144 Cal.App.4th at p. 70 [court vacated tentative ruling, ordered counsel to refile opposing papers that complied with the applicable procedural rules. "The court provided the attorneys a summary of the statutes and rules of court governing summary judgment motions, and even read California Rules of Court, rule 342(f) . . . into the record, particularly so that appellants' attorney . . . would have no remaining confusion as to the court's expectations when he refiled his clients' response to Hertz's separate statement."]; see generally *Reeves, supra*, 121 Cal.App.4th at p. 106 [dictum indicating belief that "trial courts have the inherent power to strike proposed 'undisputed facts' that fail to comply with the statutory requirements and that are formulated so as to impede rather than aid an orderly determination whether the case presents triable material issues of fact"].)

The deficiencies in summary judgment papers can appear in a variety of places, and the approaches taken by the courts to address the deficiencies can vary as well, limited only by the inspiration or creativity of the particular law and motion judge—and, of course, due process. There is no universal solution, no panacea, and we do not even attempt to offer suggestions. We write here only to confirm the existence of the inherent power, to remind trial courts of it, and to encourage them to use it when appropriate.

## DISPOSITION

The summary judgment is reversed, as the first, third, fourth, fifth, sixth, seventh, ninth, and 14th causes of action present triable issues of material fact. The summary adjudications of the eighth, 12th, and 13th causes of action are affirmed, as are the fifth, sixth, and ninth causes of action as to Petersen. Plaintiff shall recover costs on appeal.

Haerle, Acting P. J., and Lambden, J., concurred.