Filed 11/6/23  Kreindler v. Cal. Dept. of Corrections and Rehabilitation CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JONATHAN KREINDLER,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>        Defendant and Respondent. | A163234<br><br>(Del Norte County Super. Ct. No. DNSU-CVUJ-2019-1349-1) |

Appellant Jonathan Kreindler appeals from the trial court's entry of summary judgment in favor of respondent, the California Department of Corrections and Rehabilitation (CDCR) in this employment-discrimination case.  The trial court ruled in favor of the CDCR after finding no triable issues of fact on Kreindler's claim that he was constructively discharged as a result of discrimination against him based on his religious creed.  We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Kreindler is an orthodox Jewish rabbi who was hired by the CDCR in October 2015 to be the Jewish chaplain at Pelican Bay State Prison (Pelican Bay), a maximum-security facility.  His job was to support the spiritual needs

of Jewish inmates. Kreindler resigned in July 2017, complaining he had been mistreated in various ways, including by having been forced to work with a someone he described as a "self[-]proclaimed Nazi" inmate chapel clerk.

When Kreindler resigned, he sent an email stating his reasons for resigning. They included that prison officials required him to work with the "Nazi" inmate clerk, failed to protect him from another inmate who had threatened to kill him, and told some inmates that he was to blame for problems they were having with their kosher diets. During the litigation of this case, Kreindler raised additional reasons why he felt compelled to resign. These included that prison officials denied him a protective vest, delayed his access to the internet, started to discipline him for taking time off to observe Passover, and improperly handled other issues related to inmates' kosher diets. We describe the evidence surrounding each of these asserted reasons for Kreindler's resignation.

**Kreindler's claim that he was required to work with an inmate clerk who was a "self[-]proclaimed Nazi."**

In September 2016, Kreindler alleged that an inmate working as a paid chapel clerk flashed a swastika tattoo at him through a glass window separating the two of them. The chapel clerk was assigned to work in Chapel B, one of the two inmate chapels at the prison. Chapel clerks are assigned to one of the two chapels, not to particular chaplains. Kreindler had an office located in Chapel B, but he worked in both chapels, as did the other chaplains. The chapel clerk in question was a former member of the Aryan Brotherhood prison gang who was considered by the CDCR to no longer be an active gang member.

Under CDCR rules, employees are to report inmate misconduct by submitting a Form 128, which starts a disciplinary process that provides the inmate with appropriate due process. All chaplains, including Kreindler,

2

received instruction on reporting inmate misconduct. Kreindler declined to file a disciplinary action against the chapel clerk. Rather than reporting the clerk's alleged misconduct on a Form 128, Kreindler instead emailed his supervisor, Community Resources Manager Robert Losacco, about it. Losacco supervised all five of the Pelican Bay chaplains, who served the needs of inmates seeking Protestant, Catholic, Jewish, Muslim, Native American, and other religious services. In his email to Losacco, Kreindler stated, "The other day [the chapel clerk] flashed his swastika tattoo to me. Aside from the fact that he never puts away the [TV] when it is used (the [custody officers] have had to call him back to put it away), I do not feel comfortable being around him."

Although Kreindler had not pursued a disciplinary action against the chapel clerk, Losacco nonetheless looked into Kreindler's allegation. He did so because the allegation "concerned [him], as it could be an attempt to intimidate staff." He interviewed the chapel clerk and others who might have witnessed the interaction between the clerk and Kreindler, including other inmates and another chaplain. The clerk denied that he intentionally showed his tattoo to Kreindler, and he expressed his understanding that it would have been wrong for him to do so.

No other witness saw the clerk flash a tattoo or engage in any improper behavior. A Native American spiritual leader chaplain reported he recalled seeing Kreindler and the chapel clerk speaking, but did not see the clerk flash a tattoo or engage in any aggressive or hostile behavior. The chaplain told Kreindler that he should file a disciplinary action against the clerk if he thought that the clerk had flashed his tattoo, but he also explained that the clerk's tattoo and potential gang association did not itself amount misconduct that would cause an inmate to lose his inmate job assignment. For his part,

3

the chaplain "did not believe that [the clerk] intentionally tried to intimidate or 'flashed' his tattoo at . . . Kreindler." According to the chaplain, "[w]hen [Kreindler] would bring up the incident . . . details of his story kept changing." The chaplain "never saw [the clerk] engage in any improper behavior toward [Kreindler]. From what [the chaplain] saw, [the clerk] did his job well and in compliance with prison rules. [He] saw [the clerk] try to avoid interacting with . . . Kreindler after the alleged swastika incident, and [the clerk] even asked [the chaplain] for advice on what [the clerk] could do to remedy . . . Kreindler's apparent dislike for him."

Inmates cannot be summarily disciplined, and Losacco stated in his declaration that disciplinary action was not pursued against the chapel clerk because Kreindler had not filed such an action and Losacco had neither witnessed the incident nor found any evidence to substantiate Kreindler's allegation.

**Kreindler's claim that prison officials inadequately dealt with an inmate who had threatened to kill him.**

In December 2016, Kreindler canceled a scheduled inmate service because too few inmates showed up for it. Some of the inmates were agitated by the cancellation, and Kreindler responded by asking one of them whether he even had a right to attend services since the inmate had, according to Kreindler, raped his cellmate. Upset with this accusation that was made in the presence of other inmates, the inmate responded that he had not raped his cellmate, but instead "killed him, and [was] about to do the same right now."

Upon learning of the inmate's remark, the CDCR placed the inmate in administrative segregation and conducted an investigation. Kreindler had no further contact with the inmate, and the inmate was transferred to a different prison, although Kreindler believed the transfer took too long.

4

While he awaited transfer, the inmate stayed in administrative segregation, but Kreindler nonetheless "feared for his personal safety" because "inmates carry messages one way or another throughout the institution," and he feared the inmate held in administrative segregation might persuade another inmate to harm him.

**Kreindler's claim that prison officials failed to provide him with a safety vest and prompt access to the internet.**

Kreindler claims he was never issued his own personal protective vest. He claims he asked Losacco for one, and "Losacco repeatedly told Kreindler '[he was] working on it.'" Losacco attested that it was not his job to personally provide chaplains with vests and that he informed Kreindler, as he informs all new chaplains, that safety equipment is available at the prison's armory and that vests could also be checked out at various locations throughout the prison. According to Kreindler, he obtained vests by borrowing them from co-workers or getting them from the chapel office, but it was sometimes difficult to do so and vests were sometimes unavailable. On at least one occasion in the weeks after Kreindler started his job, Losacco saw Kreindler wearing a safety vest, suggesting that Kreindler had or had access to one. On July 14, 2016, Losacco sent Kreindler an email asking him, "Do you have a vest issued to you?" The next day, Kreindler responded, "I have a vest."

Kreindler also claims Losacco promised to make sure he obtained internet access, but he did not receive such access until May 2017. Employees are supposed to request internet access by submitting an approval form. Kreindler claims that no one told him about this form until late in his employment. Kreindler's internet access was finally approved when Kreindler submitted a form after another chaplain told him that such a form

5

was necessary. Before obtaining his own access, Kreindler used the internet through the assistance of other employees.

**Kreindler's claim that the CDCR started to discipline him for taking off time to observe Passover.**

On March 26, 2017, Kreindler sent Losacco a lengthy email that spans a little over one-and-a-half printed pages regarding Passover observance at Pelican Bay. At the bottom of the email he stated he would "need to be away from Tuesday the 28th of March through Wednesday April 19" in connection with Passover. Losacco attested that he did not initially notice the statement, and if he had, he would not have agreed to it. Before taking extended leave, chaplains are supposed to submit a written time-off request on a form and receive Losacco's prior approval. Kreindler did not submit such a request.

After Kreindler missed 11 non-approved consecutive shifts, an employee in the personnel office informed Losacco that Kreindler was not responding to telephone calls. The prison subsequently sent Kreindler a notice informing him that he was "absent without leave" (AWOL). The AWOL notice was withdrawn when it became apparent that Kreindler was planning to return to work, and Kreindler was not disciplined for the absence.

Losacco later gave Kreindler a work-expectations memorandum, which explained Kreindler's job duties and work expectations, including procedures for taking approved leave. Losacco asked Kreindler to meet in person about various work issues, including the memorandum, but Kreindler refused. After Kreindler repeatedly refused to meet in person, Losacco asked the warden to open an administrative review of Kreindler's conduct.

6

**Kreindler's claim that his prayer time was disrupted.**

Kreindler claims that after he returned from his absence for Passover, he learned that a conference room he had previously used for his morning prayer was unavailable. Although he was told he could use the conference room for his prayer, "the assurances were not always honored." Kreindler claims he was forced to "scramble to find an alternative place to pray which was often off grounds."

On one occasion, Kreindler's prayer was disrupted by an alarm. Kreindler did not respond to the alarm because he felt compelled to complete the prayer, which "can last from 5 to 15 minutes." A correctional officer initially indicated a desire to discipline Kreindler for not promptly responding to the alarm, but no disciplinary action was taken. Still, Kreindler claims that the incident "was publicized among coworkers and inmates, causing [him] embarrassment and humiliation."

**Kreindler's claims related to inmates' kosher diets.**

Kreindler asserts several complaints related to kosher diets. First, as we have said, in his resignation email, Kreindler claimed that during a meeting Losacco told some inmates that Kreindler was to blame for concerns they had with their kosher diets. Second, in his appellate briefing he claims that prison officials dismissed his concerns that appropriate kosher protocol was not being followed and was told, "We don't have any real Jews here anyway." Third, in his appellate briefing he also claims that he was hired to get inmates off kosher diets because of their high cost, and that Losacco, not he, was the prison employee who actually decided which inmates would receive kosher diets.

Kreindler brought this lawsuit alleging he was constructively discharged. He asserted two causes of action for employment discrimination

7

based on religion under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) that are the subject of this appeal.[1]

The CDCR filed a motion for summary judgment or, in the alternative, summary adjudication.  The parties submitted extensive evidence, although not all of it appears to have been included in the appellate record.  The register of actions reveals that the CDCR filed a three-volume appendix of evidence in support of the motion, but it is unclear how much of that evidence Kreindler included in his appellant's appendix.  Kreindler included a declaration from Losacco in his appellant's appendix, but *none* of the 42 exhibits attached to it (though the CDCR included them in its respondent's appendix).  He also included in his appellate appendix a declaration of a former Pelican Bay Native American Spiritual Leader chaplain, along with the four attached exhibits.

In support of his opposition to the motion in the trial court, Kreindler submitted a declaration and a three-part "deposition appendix," consisting mostly of excerpts from his deposition, along with 25 pages of Losacco's deposition and a single page of another witness's deposition.  He included these materials in his appellant's appendix.  But he did not include the trial court's order sustaining many of CDCR's objections to the evidence Kreindler submitted (though the CDCR included the order in its respondent's

---

[1] Kreindler also alleged a cause of action for retaliation in violation of FEHA (Gov. Code, § 12940, subd. (h)) and a cause of action for whistleblower retaliation in violation of Labor Code section 1102.5.  The trial court entered judgment in favor of the CDCR on Kreindler's entire complaint.  On appeal, Kreindler does not argue that the trial court's grant of summary adjudication of his retaliation claims should be reversed, and he has thereby forfeited any such challenge.  (See *Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811.)

appendix). Kreindler also omitted all briefing submitted in connection with the summary judgment motion.

In what was later characterized as a "preliminary order" granting summary judgment, the trial court found "there [was] no constructive discharge and certainly no adverse job action based on [Kreindler's] status as a Jewish Rabbi." As to these issues, the court found no triable issues of fact. The court directed the CDCR "to prepare an Order Granting Summary Judgment together with any findings necessary to support same consistent with this opinion, together with a form of judgment." The CDCR prepared such an order, which was signed by the court. Again, Kreindler did not include this order in his appellant's appendix; it was instead submitted by the CDCR in its respondent's appendix.

II.
DISCUSSION

A. *The Governing Law.*

1. The Law Governing Claims of Constructive Discharge as the Result of Discrimination on the Basis of Religious Creed in Violation of FEHA.

A constructive discharge occurs when an employee is coerced into resigning, and the resignation was "not caused by the voluntary action of the employee or by conditions . . . beyond the employer's reasonable control." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1248 (*Turner*); *Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 826-827.) The constructive-discharge doctrine transforms an ostensible resignation into a firing. A resignation is coerced if the "employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a

9

reasonable person in the employee's position would be compelled to resign." (*Turner,* p. 1251.)

The "adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra*, 7 Cal 4th at p. 1247.) " '[S]ingle, trivial, or isolated acts of [misconduct]' " are generally not sufficient to support a finding of constructive discharge. (*Ibid.*) Although the question of whether conditions were so intolerable as to amount to a constructive discharge is usually one of fact, summary judgment may be appropriate where the employee's decision to resign is unreasonable as a matter of law. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1022.)

Even if a constructive discharge is established, the employee must still prove legal wrongdoing, such as breach of contract or a statutory violation, to prevail. (*Turner, supra*, 7 Cal.4th at p. 1251.) The statute alleged to have been violated here is FEHA, which prohibits discrimination in compensation or in the terms, conditions, or privileges of employment because of an employee's protected status, including the employee's "religious creed." (Gov. Code, § 12940, subd. (a).) "A claim asserting a violation of this provision is a 'disparate treatment' claim," and the elements are the following: " ' "(1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the discriminatory animus and the adverse action; (5) damage to the employee; and (6) a causal link between the adverse action and the damage." ' " (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 979.) There is no dispute that Kreindler was a member of a religious faith protected by FEHA. The trial court focused

10

primarily on the third element, that is, whether the CDCR took any action adverse to Kreindler's interests. We focus instead on the lack of a triable issue on whether the CDCR acted with discriminatory animus toward Kreindler, another issue the CDCR raised in its motion for summary judgment.

In many disparate treatment cases, especially those in which the employer seeks summary judgment, the elements most likely litigated are "the existence of discriminatory animus and a causal link between it and the challenged action." (*McCaskey v. California State Automobile Assn., supra*, 189 Cal.App.4th at p. 979.) "Proof of these elements 'is likely to depend on circumstantial evidence, since they consist of subjective matters only the employer can directly know, i.e., [the employer's] attitude toward the plaintiff and [the employer's] reasons for taking a particular adverse action.' " (*Ibid.*)

2. The Standard of Review for Motions for Summary Judgment.

Summary judgment may be entered when "there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) For a defendant to meet its initial burden when moving for summary judgment, it must demonstrate " 'that a cause of action has no merit' " by showing either " 'that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action.' " (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

Once a defendant satisfies its initial burden, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) A plaintiff cannot defeat that motion by relying on "assertions that are 'conclusionary, argumentative or based on conjecture and

11

speculation,' but rather [is] required to 'make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact.' " (*Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1404.)  A mere scintilla of evidence alone cannot defeat summary judgment.  (See *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 ["The purpose of the summary judgment procedure . . . is to identify those cases in which there is no factual issue which warrants the time and cost of factfinding by trial"].)

In evaluating a trial court's grant of summary judgment, a reviewing court reviews the record de novo, "liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party."  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)  If summary judgment was properly granted on any ground, we affirm "regardless of the trial court's stated reasons."  (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1155.)  Although summary judgment is no longer a disfavored procedure, "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper, . . . [and] rarely appropriate for disposition on summary judgment, however liberalized it be."  (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286.)  Still, a summary judgment is presumed to be correct if the appellant fails to meets the burden to affirmatively show error.  (See *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 252.)

### 3. The Analytical Framework to Assess a Claim of Discrimination on the Basis of Religious Creed.

A claim under FEHA of employment discrimination based on the employee's religious creed is assessed under the analytical framework

12

established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (See *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1156.) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.) The *McDonnell Douglas* framework "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially . . . . [B]y successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra*, 24 Cal.4th at p. 354.) Under this test, the plaintiff has the initial burden of producing evidence that establishes a prima facie case of discrimination. (*Ibid.*) Generally, the plaintiff can meet this burden by presenting evidence that demonstrates, even circumstantially or by inference, that (1) the plaintiff belongs to the relevant protected classes or was perceived as belonging to them; (2) the plaintiff was performing their job satisfactorily; (3) the plaintiff suffered an adverse employment action such as termination; and (4) there was a causal connection between the adverse action and the plaintiff's protected classifications. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 235 (*Moore*).)

If the plaintiff establishes a prima facie case, creating a "presumption of discrimination," the burden shifts to the employer to provide " 'a legitimate, nondiscriminatory reason for the challenged action.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860–861.) Under the third step of the *McDonnell Douglas* framework, "the 'plaintiff must [then] . . . have the opportunity to attack the employer's proffered reasons as

13

pretexts for discrimination, or to offer any other evidence of discriminatory motive.' " (*Serri*, at p. 861.) The employer's burden to provide a legitimate nondiscriminatory reason is one of production, not persuasion, and the employer " ' "need not persuade the court that it was actually motivated by the proffered reasons . . . [but only] raise[ ] a genuine issue of fact as to whether it discriminated against the [plaintiff]." ' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201 (*Caldwell*).) Once the employer satisfies this burden, the presumption of discrimination created by a prima facie case " ' "drops from the case" and the factfinder must decide upon all of the evidence before it whether [the] defendant intentionally discriminated against [the] plaintiff. [Citation.] In short, the trier of fact decides whether it believes the employer's explanation of its actions or the [plaintiff's].' " (*Ibid.*)

The *McDonnell Douglas* framework is "an analytical tool for use by the trial judge in applying the law, not a concept to be understood and applied by the jury in the factfinding process." (*Caldwell, supra*, 41 Cal.App.4th at p. 202.) "[I]n the usual case, the first two prongs of the [framework], that is, whether the plaintiff has stated a prima facie case of discrimination and whether the employer has rebutted that prima facie showing, will be tested prior to trial," such as through a motion for summary judgment. (*Ibid.*)

### 4. The *McDonnell Douglas* Framework in the Context of a Defendant's Motion for Summary Judgment.

As an analytical tool for assessing a discrimination claim, the *McDonnell Douglas* framework "does not affect the procedural rule . . . that imposes on a defendant the initial burden when that party seeks summary [judgment]." (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 926.) As a result, a motion for summary judgment brought by a defendant

14

employer " ' "slightly modifies the order of [the *McDonnell Douglas*] showings." ' [Citation.] Consequently, [the employer has] the initial burden to either (1) negate an essential element of [the plaintiff's] prima facie case [citation] or (2) establish a legitimate, nondiscriminatory reason for [the adverse employment action]." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160 (*Wills*).)

Once the employer has made such a showing, the employee can avoid summary judgment only by offering " 'substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.] [¶] 'As several federal courts have stated: "The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." ' " (*Wills, supra*, 195 Cal.App.4th at p. 160.) " '[S]peculation cannot be regarded as substantial responsive evidence.' " (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038 (*Cucuzza*); *Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1563–1564 [employee's " 'suspicions of improper motives . . . primarily based on conjecture and speculation' " clearly not sufficient to raise a triable issue of fact to withstand summary judgment].)

" ' " 'In short, by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, "the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury." ' . . . Thus, ' "[a]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [adverse employment action] ultimately rests

15

with plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, *the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue . . . .* In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion." ' " ' " (*Moore, supra*, 248 Cal.App.4th at p. 236.)

"In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) Thus, even though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of motive, a material triable controversy is not established unless the inference is reasonable. And an inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation." (*Cucuzza, supra*, 104 Cal.App.4th at p. 1038.) "If plaintiff fails to produce substantial responsive evidence to demonstrate a material triable controversy, summary judgment is properly granted." (*Id.* at p. 1039.)

B. *The Trial Court Properly Granted Summary Adjudication in Favor of the CDCR on Kreindler's Claims that He Was Constructively Discharged for Discriminatory Reasons.*

On appeal, Kreindler argues that the trial court improperly granted summary judgment in favor of the CDCR, because there are genuine issues of material fact as to whether he was constructively discharged for discriminatory reasons. We are not persuaded.

We begin by noting that our ability to consider the appellate arguments has been hampered by the shortcomings of the appellate record. Kreindler's opening brief relies almost entirely on the evidence he submitted in

opposition to the motion for summary judgment, without meaningfully addressing the evidence that was submitted in support of the motion. He devotes a whole section in his opening brief to complaining that the trial court improperly weighed evidence when it ruled on summary judgment. But he relies only on the trial court's first preliminary order, and not on the second order signed by the trial court.

Kreindler devotes another section in his opening brief to the argument that the trial court's failure to address his constructive-discharge theory precluded summary judgment. But he relies only on the theory he alleged *in his complaint*, and not on the arguments made in connection with the summary judgment motion. He asserts, without citation to the record, that the "CDCR implicitly contended in its moving papers that it was entitled to summary judgment because its view of the facts were more likely true than those of the Appellant." But we have no way of evaluating that claim without the underlying memorandum of points and authorities. The same goes for Kreindler's assertion, again without citation to the record, that the CDCR's motion "ignored" his complaint's allegations of constructive discharge. The final order granting summary judgment stated that the court found as a matter of law that there was no constructive discharge in this case.

Even assuming we have an adequate record to assess Kreindler's claim that he was constructively discharged, we question whether the evidence raised a triable issue on the merits. It is not evident to us that a reasonable employer in CDCR's position would have realized that a reasonable person in Kreindler's position would have felt compelled to resign, or that Kreindler's resignation was "not caused by the voluntary action of [his] or by conditions . . . beyond the [CDCR's] reasonable control." (*Turner*, *supra*, 7 Cal.4th at p. 1248.) The unique environment of high-security prisons

17

requires workers to work around criminals and face challenging circumstances. Had a coworker in a non-prison context, as opposed to an inmate at a maximum-security prison, displayed a swastika tattoo around Kreindler, we would analyze the facts from a different perspective.[2] But encountering people with disagreeable backgrounds, qualities, and affiliations is characteristic of working in a maximum-security prison. We ultimately need not decide the constructive-discharge issue, however, because we affirm the trial court's summary judgment on the separate ground that the CDCR satisfied its burden of negating essential elements of Kreindler's prima facie case—i.e., that prison officials acted with a discriminatory animus in causing the circumstances about which he complains—and Kreindler failed to present substantial evidence that would support reasonable inferences to the contrary.[3]

In his opening brief, Kreindler argued there are triable issues of discriminatory animus because of the "evidence of the swastika" and the CDCR's response to it, and the "evidence that Kreindler was hired to help

---

[2] There is no question that the swastika is " 'one of the most offensive and condemned symbols in much of the United States and the western world.' " (See *Kaushal v. Hyatt Regency Woodfield* (N.D.Ill. 1999) 1999 U.S.Dist. LEXIS 9563, at p. *9.) That is why the court in *Kaushal*, quoted by Kreindler, noted it would be "unthinkable" for hotel management to sanction its display, however temporary, by a plaintiff hotel employee who claimed he was improperly fired for drawing the symbol as part of his Hindu religion.

[3] We therefore reject Kreindler's argument that summary judgment was categorically precluded because there were triable issues as to whether he was constructively discharged. As we have said, the constructive-discharge doctrine is not a claim on its own and is the basis for relief only if another legal wrong, such as a breach of contract or statutory violation, is shown. (*Turner, supra,* 7 Cal.4th at p. 1251.)

stamp out observance of the Jewish religion at Pelican Bay." In his reply brief, he added that there are also issues of discriminatory animus because evidence was presented that he was treated differently from non-Jewish chaplains, and that the CDCR discriminated against Jewish inmates. None of these arguments are persuasive.[4]

The allegation that the chapel clerk flashed a swastika tattoo at Kreindler does not establish a triable issue regarding prison officials' discriminatory animus. To begin with, as repugnant as is such a tattoo (*supra*, fn. 2), if one was flashed it was flashed by the clerk, and Kreindler presented no evidence suggesting that any prison official participated in or condoned the act. To the contrary, even though Kreindler himself failed to bring a disciplinary charge against the clerk, Losacco took it upon himself to look into the incident. This response showed a concern about the allegation, not a discriminatory animus towards Kreindler. While there is a factual dispute as to whether the clerk did in fact flash a tattoo, there is no dispute about Losacco's response to Kreindler's allegation. A discriminatory animus cannot be inferred simply because the investigation failed to corroborate wrongdoing by the clerk or that, as a result, Losacco initiated no disciplinary action against the clerk. And no evidence was presented to support a reasonable inference that Losacco or any other prison official ever responded, or would respond, differently to any comparably situated non-Jewish chaplain.

---

[4] Because these are the bases of Kreindler's claim that prison officials acted with a discriminatory animus, we do not further discuss the other reasons he gave for resigning—that prison officials inadequately dealt with the prisoner who threatened to kill him, started to discipline him for taking time off to observe Passover, and disrupted his prayer time—since they apparently relate solely to his claim that he was constructively discharged.

Kreindler complains that after the alleged incident Losacco failed to prevent the clerk and Kreindler from working in the chapel area at the same time. At his deposition, Kreindler testified that after the alleged flashing incident the clerk was "being hostile" and giving him "bizarre looks." But before he resigned, Kreindler reported no further aggressive or hostile actions by the clerk to Losacco, and Losacco was aware of none. In April 2017, Kreindler sent Losacco an email asking what he had "done to remove/replace [the clerk]." Losacco responded, "Nothing, I will not remove [the clerk]. He has done nothing wrong. You will need to work with the [c]lerks that are assigned to that area. [The clerk] is trying very hard to leave his past behind and is a model clerk. He knows how you feel, he makes every attempt to cover his [t]attoos, work hard trying to please you and has nothing but positive things to say about you. Until [the clerk] does something to warrant being removed from the chapel he will remain as the [c]lerk."

Kreindler may have understandably not wanted to continue working with the clerk, but the only reasonable inference that can be adduced from the evidence is that Losacco declined to separate the two because no disciplinary action was brought against the clerk and Kreindler 's allegation was not corroborated. No reasonable inference can be adduced that Losacco was motivated by a discriminatory animus, and Kreindler's speculation that it was is not substantial responsive evidence. (See *Cucuzza, supra,* 104 Cal.App.4th at p. 1031.) Kreindler failed to create a triable issue because he presented no evidence that "relate[d] to the motivation of the decision makers and prove[d], by non-speculative evidence, 'an actual causal link between prohibited motivation and [the adverse employment action].' " (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1159 (*Featherstone*).)

As to the supposed evidence that Kreindler was hired to stamp out observance of the Jewish religion, Kreindler argues there is a triable issue about Losacco's alleged participation in an effort to have inmates removed from receiving a kosher diet.  Again, we have an inadequate record upon which to fully consider the argument.  The only issue relating to kosher diets that clearly appears to have been litigated in the trial court was Kreindler's complaint that kosher food was not being prepared properly.  Without the memoranda of points and authorities filed in connection with the motion for summary judgment, we simply cannot know if and how other kosher-diet issues were actually litigated below.  And as to some of the testimony Kreindler submitted in opposition to summary judgment, the trial court sustained the CDCR's objections to many of his statements about kosher diets.

Although we review the grant of summary judgment de novo, "[a]s with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error." (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.)  Thus, an appellant "has the burden of providing an adequate record" to enable our review.  (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.)  Since the record does not establish that kosher-diet issues (other than the food-preparation issue) were litigated in the trial court, we consider those issues forfeited.  (See *Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 489; see also *Jordan– Lyon Productions, Ltd. v. Cineplex Odeon Corp.* (1994) 29 Cal.App.4th 1459, 1472 [" 'The rule which forbids raising a new issue for the first time on appeal takes on added significance in summary judgment proceedings because "[t]he moving party's burden on a motion for summary judgment is only to 'negate the existence of triable issues of fact in a fashion that [entitles] it to judgment

on the issues raised by the pleadings. [Citation.] It [is] not required to refute liability on some theoretical possibility.' " ' "].)

We nonetheless proceed to consider Kreindler's argument as best we can, and we reject it on its merits. Kreindler contends that Losacco hired him not for the purpose of doing work as a Jewish rabbi, "but for an ulterior purpose of removing inmates from the [k]osher meal program." He claims that when he was hired, Losacco told him to "help me get these idiots off the [kosher] diet" and that there were no Jews in the prison population. Kreindler testified that Losacco said, "Listen, there is no one Jewish here. The Warden wants these guys off the diet. No one's exempt. You send me an e-mail using Judaism to show that they don't need it." According to Kreindler, "Losacco's attention was focused on how much the [k]osher [d]iet cost." Kreindler was not impressed with this concern because "[k]osher [f]ood's supposed to cost more."

Losacco maintained that Kreindler, as the Jewish rabbi, was supposed to have the best knowledge of whether specific foods were kosher, and he had the authority to add an inmate to the list of those who were to receive a kosher diet. Losacco did not deny any request of Kreindler's to add an inmate to the list.

On at least one occasion, Kreindler took the position that an inmate should not receive a kosher diet because the inmate, according to Kreindler, was not actually Jewish because he was not born to a Jewish mother. And at least once, Losacco overruled Kreindler in such a circumstance and allowed the inmate to receive the kosher diet. Losacco did so because under the applicable policies inmates do not need to be Jewish to obtain a kosher diet, they only need a sincere religious belief that they need a kosher diet.

Kreindler also contends that Losacco told him to go with prison guards to inspect the cells of inmates who were receiving a kosher diet. For his part, Losacco declared that he instructed Kreindler to work with custody staff when it came to checking inmates' cells for non-kosher food, and that going to inmates' cells was a part of a chaplain's duties, whether to monitor a religious-diet issue or to engage in cell-front pastoring. On occasion, Kreindler reported to Losacco his findings about inmate compliance with the kosher-diet rules.

None of this evidence creates a triable issue as to discriminatory animus towards Kreindler. The undisputed evidence is that part of Kreindler's job duties was to ensure that inmates receiving a kosher diet complied with applicable prison policies and inmate contracts, which included acknowledgements that noncompliance would result in inmates' removal from the kosher program. It was legitimate for prison officials to want to ensure that kosher diets are restricted to inmates who follow prison policies and the terms of their contracts. Kreindler presented no non-speculative evidence linking any alleged hostility towards inmates who were on a kosher diet to any unfavorable treatment he allegedly received. (See *Featherstone, supra,* 10 Cal.App.5th at p. 1159.)

Finally, we are similarly unpersuaded by Kreindler's argument that there is a triable issue on discriminatory animus because he was allegedly treated differently from non-Jewish chaplains. To begin with, Kreindler points to little, if any, evidence supporting his claim. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 ["Circumstantial evidence of ' "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' on an improper basis"].)

Without citing to the record, Kreindler says he was treated differently because his fellow chaplains and Losacco "appeared to have had their own vests, which were kept in their offices." But the trial court sustained the CDCR's objection as to Kreindler's proffered evidence on this point. None of the court's evidentiary rulings were appealed, and they are therefore final. (See *Cox v. Bonni* (2018) 30 Cal.App.5th 287, 301, 311.) Kreindler also claims he was treated differently because his access to the internet was delayed. But the evidence showed that at least one other chaplain also had difficulty obtaining internet access. When Kreindler finally received internet service, he sent Losacco an email saying, "What could have taken three business days, took 15 months . . . sad." Losacco responded, "I know right, look how quickly [it] happens when you take the initiative and fill out the appropriate paperwork and go through the proper channels. Easy." Taken as a whole, the evidence simply does not support a reasonable inference that the *reason* Kreindler was not issued a personal safety vest, delayed internet access, or faced the other circumstances about which he complains had anything to do with prison officials' animus toward his religious creed. (See *Cucuzza, supra*, 104 Cal.App.4th at p. 1038.)

We do not doubt that Kreindler faced difficult working conditions. Few people would imagine that working with inmates housed in a high-security prison such as Pelican Bay would be easy, and plenty might reasonably decline to accept a job in such an environment, or decide not to stay in one for long. But facing the hardships of working in a high-security prison does not establish actionable unlawful discrimination. Here, the CDCR satisfied its burden of negating essential elements of Kreindler's prima facie case— discriminatory animus and causation—and of establishing legitimate, non-discriminatory reasons for it actions. In response, Kreindler failed to offer

24

substantial evidence that prison officials acted with discriminatory animus, that any such animus caused the circumstances about which he complains, or that the CDCR's stated reason for its actions were pretextual.

We lastly mention some evidence unrelated to Kreindler's specific arguments on appeal, because it provides additional context for his claims. This evidence shows that the CDCR accommodated many of Kreindler's requests for religious accommodations. Kreindler was the only chaplain allowed to work four ten-hour days, instead of five eight-hour days, per week. In fall 2016, Losacco approved a request by Kreindler to use paid leave for time for religious observances that he claimed were necessary to be a Jewish rabbi.[5] And Kreindler was provided with a conference room for his personal prayers that was generally available to him, and he was typically given advance notice when it was not.

While he worked at Pelican Bay, Kreindler increasingly complained about perceived slights, but he often caused or contributed to his own difficulties. For example, he declined to bring a disciplinary action against the chapel clerk, and he failed to submit the necessary forms (or take the initiative to learn about the necessary process) for obtaining a safety vest, gain access to the internet, or receive prior approval before taking extended leave. Rather than working constructively and collaboratively to address issues, he frequently simply complained that others were not doing enough. Eventually, Kreindler became insubordinate by refusing to meet Losacco in person, and he became the subject of grievances by inmates who alleged he insulted them, discriminated against them, and interfered with their

---

[5] Losacco and Kreindler were both subsequently counseled that non-paid leave was required to be used for such leave going forward, which generated more complaints from Kreindler.

25

religious observance.[6]  These grievances culminated in early July 2017 with a second request for an administrative review, this time for his being "disrespectful and insulting to inmates" and denying them "services and important religious observances."  This request was made the day before he resigned on July 7.

From the evidence as a whole, reasonable inferences can be made that Kreindler was dissatisfied with his job and that prison officials became frustrated with him, but no reasonable inference can be made based on the record before us that officials acted towards Kreindler with a discriminatory animus or that any such animus caused the circumstances that he claims forced him to resign.

## III.
### DISPOSITION

The judgment is affirmed.  The CDCR is awarded its appellate costs.

---

[6]  The chapel clerk submitted a grievance alleging that Kreindler had treated him unfairly, including by sending him back to his cell on a Sunday when he was practicing guitar for worship service.  Another inmate submitted a grievance alleging that Kreindler had called him a "goy" and interfered with his receipt of a Jewish meal for Seder.

_____
Humes, P.J.


WE CONCUR:


_____
Banke, J.


_____
Getty, J.*


     *Judge of the Superior Court of the County of Solano, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Kreindler v. California Department of Corrections and Rehabilitation*
A163234